THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE McBRIDE, Defendant-Appellant.

First District (5th Division)   No. 84—2803

Opinion filed June 26, 1987.

LORENZ, J., specially concurring.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Karyn Stratton, and Lori Schultz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a trial by the court, the defendant, Willie McBride, was found guilty of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) of Diane Neil on July 20, 1983, in Chicago and he was sentenced to 10 years' imprisonment. On this appeal he contends for reversal that, because he was arrested "for investigation" and without probable cause, the trial court erred in overruling his motion to quash his arrest and suppress his statements.

The defendant urges that his arrest by Chicago police detectives Peterson and Harrington violated his constitutional right to be secure in his person against unreasonable seizure, guaranteed by the fourth and fourteenth amendments to the United States Constitution and section 6 of article I of the Illinois Constitution.

The fourth amendment to the United States Constitution, in pertinent part, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, ***." U.S. Const., amend. IV.

The pertinent provision of the fourteenth amendment to the United States Constitution, which makes the fourth amendment binding on the States, *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d

1081, 81 S. Ct. 1684, provides:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law; ***." U.S. Const., amend. XIV, sec. 1.

Section 6 of article I of the Illinois Constitution provides, in pertinent part:

"The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. ***." Ill. Const. 1970, art. I, sec. 6.

The defendant, Willie McBride, and Chicago police detective Stephen Peterson were the only witnesses on the hearing of the defendant's motion to quash the defendant's arrest and suppress his statements. Their testimony established that Chicago police detectives Stephen Peterson and Harrington went to the production office where the defendant was employed, Printing Arts, 500 South Clinton Street in Chicago, on July 21, 1983, at approximately 3 p.m. The detectives directed the defendant's supervisor, Dennis Durkennis, to have the defendant leave his work area and come to the production office. Durkennis did so. When the defendant arrived in the office, the detectives showed the defendant their police badges and asked the defendant his name. The defendant told the detectives his name, whereupon the detectives directed the defendant to turn around and put his hands behind his back. When the defendant asked, "For what?" the detectives responded, "So you don't run." The defendant complied with the detectives' command and they cuffed the defendant's hands behind his back. The detectives told the defendant that they were taking him to the police station "for investigation" of the Diane Neil homicide. The detectives took the defendant to the police station, chained him to a wall and questioned him. The defendant made several exculpatory statements.[1]

---

[1]The record reveals that the defendant initially denied to the detectives that he had any knowledge of the Diane Neil homicide and asserted an alibi. Later, at about 5 p.m., when the detective told the defendant that his witness did not verify, but contradicted, his alibi, the defendant then asserted a second alibi. At about 7 p.m. the detectives told the defendant that his second alibi was also uncorroborated and disputed. Thereupon, the defendant told the officers that he had paid an acquaintance to "shake up" Diane Neil and that the acquaintance told him that he, the acquaintance, had shot her. The defendant later retracted this statement and told the detectives that Diane Neil pulled the gun on him, that he attempted to wrestle the gun from her and that she was shot during the struggle.

In overruling the defendant's motion to quash his arrest and suppress his statements, the trial court commented, *inter alia*:

"If the officer were to ask me my opinion as to what he should do under these circumstances I would of course suggest that he go to the place of employment, request Mr. McBride to accompany him to the station for the statement and not place him in handcuffs and not place him under arrest. The officer did not seek my opinion."

The defendant contends before this court that his arrest by the detectives "for investigation" violated his constitutional right to be secure in his person against unreasonable search and seizure. On oral argument before this court, the court inquired of the State if the detectives' testimony that they took the defendant into the police station "for investigation" could be discounted. The question was not answered.

An arrest "for investigation" or "for questioning" was condemned and held to violate the fourth amendment's constitutional right of security of person against unreasonable seizure in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. In *Brown* two Chicago detectives were investigating the murder of Roger Corpus, which occurred on May 6, 1968. On May 13, as Brown climbed the stairs leading to the rear entrance of his Chicago apartment, the detectives pointed their revolvers at him and told him, "Don't move, you are under arrest." The detectives ordered Brown to stand against the wall and they searched him. When he denied that he was Brown, the detectives showed Brown his picture, informed him that he was under arrest for the murder of Roger Corpus, handcuffed him, took him to the squad car and to the police station, where Brown confessed to his participation in the Corpus murder.

In the hearing of Brown's motion to quash his arrest and suppress his confessions, the detectives testified that "they made the arrest for the purpose of questioning Brown as part of their investigation of the murder of a man named Roger Corpus." The trial court denied Brown's motion to quash his arrest and suppress his confessions and the confessions were admitted as evidence against him at his trial for the murder of Corpus. Brown was convicted. The supreme court affirmed. *People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356.

In reversing the supreme court and holding that Brown's arrest was unconstitutional and illegal, the following language of the Supreme Court is applicable to the defendant's arrest in the case at bar:

"The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that

fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' [Citation.] The arrest, both in design and execution, was investigatory. The detectives embarked upon this expedition in the hope that something might turn up." *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262-63.

In the case at bar, "the arrest, both in design and execution, was investigatory" and in the case at bar, as in *Brown*, it too is quite apparent that "the detectives embarked upon this expedition in the hope that something might turn up."

In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the Supreme Court again held that an arrest without probable cause for investigation or interrogation is constitutionally invalid. In *Dunaway*, a pizza parlor proprietor was killed during an attempted robbery. Six months later, the detectives received information from an informant, who was in jail awaiting trial for burglary, that Dunaway was involved in the murder-robbery. Even though the informant did not furnish enough information to obtain an arrest warrant for Dunaway, the detectives nevertheless arrested him, took him to a police station where he was questioned, made statements and drew sketches which implicated him in the crimes. His motion to suppress the statements and sketches was overruled by the trial court. The Supreme Court reversed and held:

> "[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258-59.

The Supreme Court further stated in *Dunaway*:

> " 'The requirement of probable cause has roots that are deep in our history.' [Citation.] Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' " 442 U.S. 200, 213, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2257.

■ The meager facts known to Detectives Peterson and Harrington in the case at bar did not establish probable cause for the defendant's arrest. The scanty information which Peterson and Harrington had in their possession did not even measure up to a "common rumor or report," or "suspicion" and certainly did not amount to "even strong reason to suspect" the defendant, Willie McBride. See *Dunaway v. New York* (1979), 442 U.S. 200, 213, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2257; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

■ The supreme court stated in *People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, that "[p]robable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. *** [A] 'mere suspicion' that the person arrested has committed the offense is an insufficient basis for arrest."

The sparse facts within the arresting officer's knowledge in the instant case were insufficient to warrant a man of reasonable caution in believing that the defendant had committed the homicide of Diane Neil. Detective Peterson's testimony on the hearing of the motion to quash arrest established that he and his partner arrived at the homicide scene, the intersection of Elizabeth and Lake Streets, on July 20, 1983, at approximately 10:55 p.m. This was 45 minutes after Freddie McDaniel had discovered Diane Neil, mortally wounded from multiple gun shots, in the car in the intersection. McDaniel had put the car in park, turned the ignition off, returned to his place of employment close by and called the police. Freddie McDaniel was not called as a witness. Thus his descriptions of the scene, the car or its contents were not established. Peterson did not testify that McDaniel gave him any descriptions of the homicide scene or car. There was no evidence presented that the homicide scene was preserved and protected from contamination or that it was not altered by a curious public before or after McDaniel discovered the victim, or before Detective Peterson arrived.

Diane Neil was not at the scene when Detective Peterson arrived. She had been removed to Cook County Hospital, where she was pronounced dead from five gunshot wounds. The evidence does not establish how much time elapsed between Diane Neil's removal from the scene and Peterson's arrival at the scene.

The right-passenger front door window of the car was broken out. No evidence was presented to establish the method that was employed to break the window. At approximately 216 North Elizabeth,

Peterson found auto glass, a pair of glasses with a missing lens and a fingernail, all within 15 to 20 feet of each other. The evidence does not establish the distance or the direction these articles were found from the car and the State offered no theory or explanation on how the articles got there, *i.e.*, whether they were dropped there by Neil's assailant or someone else, or whether Neil discarded them there.

Inside the car, Peterson found the lens to the sunglasses, a purse, a wallet and money strewn on the floor of the car. Peterson found credit cards in the wallet. The credit cards were in the names of Diane Neil and Dr. Hammat. A check of the license plates on the car revealed that the car was owned by Dr. Hammat, which information Peterson testified was obtained about two or three o'clock in the morning. No explanation was offered for this seemingly inordinate delay in obtaining the information that Dr. Hammat was the owner of the car. Peterson testified that because of the lateness of the hour, however, he decided not to then contact Dr. Hammat and notify him of the demise of Diane Neil but chose rather to contact him later during the daylight hours when they resumed work at 8:30 a.m. It might appear that Peterson had thereby, without a basis therefore, conceivably eliminated Dr. Hammat as a possible suspect in the Diane Neil homicide.

In overruling the motion to quash the defendant's arrest, the trial court concluded, in the absence of any supporting evidence:

> "There is a discernment on the part of the police and a reasonable one, I believe, that robbery was not the motive in this case. And if robbery were [*sic*] the motive they could further eliminate that motive involved in this case."

First, there is not one iota of evidence that the officers eliminated robbery as a motive in Neil's homicide. Second, from McDaniel's testimony and Peterson's description of the homicide scene and car, *i.e.*, the broken passenger window, the open driver's door, the wallet, purse and money strewn on the auto floor and the mortally wounded Neil, it could be reasonably assumed, certainly at least considered, that the shooting might possibly have occurred during an aborted robbery attempt.

Third, the trial court further concluded in overruling the motion to quash the defendant's arrest, again without any supporting evidence:

> "Ordinarily an armed robber who fires and realizes he has struck a victim leaves the scene and does not stay to fire additional shots. In this case a total of five."

There is not one scintilla of evidence in the record of what an armed robber ordinarily does when he "fires and realizes he has struck a victim." There is not one shred of evidence in the record that "an armed robber who fires and realizes he has struck a victim leaves the scene and does not stay to fire additional shots." Apparently, this was information within the exclusive knowledge of the trial court, untested and untestable by cross-examination. Moreover, there is no evidence that Detective Peterson was aware of this ordinary conduct of an armed robber, peculiarly within the knowledge of the trial court, or that Peterson relied on this unique information as a factor in his decision to arrest the defendant.

In *People v. Wallenberg* (1962), 24 Ill. 2d 350, 353-54, 181 N.E.2d 143, the supreme court, in reversing the trial court, held:

"During the pronouncement of the guilty verdict, the court commented on the testimony of the defendant and said: 'He told me there were no gas stations on that stretch of the street where he could get air. I happen to know different. I don't believe his story.' There had been no evidence introduced to rebut the defendant's testimony that there were no gas stations along the route he travelled.

This court has held that the deliberations of the trial judge are limited to the record made before him during the course of the trial. A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law."

■ In the case at bar the trial judge's reliance on his private knowledge of the ordinary conduct of armed robbers, untested on cross-examination, in determining that there was probable cause for the defendant's arrest likewise denied the defendant due process and demands reversal.

Detectives Peterson and Harrington went to Dr. Hammat's office the morning of July 21 at about 10 or 10:30 a.m. Dr. Hammat's office was on West Lake Street, the exact address of which the record does not reveal. It is noteworthy that Diane Neil was found mortally wounded in Dr. Hammat's car on West Lake Street at Elizabeth. The record likewise does not reveal the distance or the direction from Lake Street and Elizabeth to Dr. Hammat's office.

Dr. Hammat told the detectives that he was doing some work for Diane Neil at his office, that he had last seen her about 2:30 p.m. the previous day, that he was the owner of the car in which she was found shot and that he had given the car to Diane, that he rented for

her the townhouse in which Diane lived at 1111 South Ashland, that the credit cards found in Diane's wallet belonged to him but they were for her use, that Diane was married but that she was due to get a divorce soon.

After the detectives interviewed Dr. Hammat for an hour and a half or possibly two hours, Diane Neil's husband, George Neil, called and asked Dr. Hammat if he knew where Diane was. Dr. Hammat explained to George Neil what had occurred and George Neil came to Dr. Hammat's office, where the detectives interviewed him.

George Neil told the detectives that he was married to Diane Neil but that she had also married the defendant, William McBride, on Valentine's Day. Neil knew the year of the marriage from a marriage certificate from the Bureau of Vital Statistics which he had in his possession but Peterson did not recall the year. Diane Neil was married to George Neil and Willie McBride at the same time. This was the first time that the detectives had heard of the defendant, Willie McBride.

George Neil told the detectives that in March 1983 Diane Neil told him that she had had McBride arrested for aggravated assault, which arose out of McBride's pointing a gun at her, that Diane recently told him that she was going to leave McBride and move back with him. Neil gave the detectives Willie McBride's Illinois license plate number, which the detectives had their office check and verify that it was McBride's license number.

George Neil further stated to the detectives that about 8 p.m. on July 20 he called Diane Neil at her 1111 South Ashland apartment and when McBride answered the phone he hung up. Neil stated that approximately 45 minutes later, Neil had his daughter call and ask for Diane. McBride answered the phone and gave it to Diane. George Neil told the detectives that Diane told him during this telephone conversation that she was leaving McBride and that she was coming to visit with George Neil. George Neil said to the detectives that McBride was in the apartment with Diane Neil when she talked to him on the telephone. George Neil did not tell the detectives that Diane and McBride were arguing and Diane did not tell George that she and McBride were arguing during the night of July 20 when George had the telephone conversation with Diane.

George Neil told the detectives that Diane Neil called him later that night at 9:46 p.m. and told him that she was packing a suitcase of clothes, that she would be leaving within two minutes and for him to expect her at his home on the north side and that he did not thereafter speak to Diane Neil.

From Dr. Hammat's office the detectives called the police station,

had a name check run on Willie McBride and found that McBride was arrested on March 2, 1983, and charged with aggravated battery against Diane Neil. The detectives did not read any police case report relative to the case and they did not ascertain and did not know the disposition of the charge. From McBride's March 2, 1983, arrest report, the detectives learned that McBride was employed at a printing company at 500 South Clinton.

Detective Peterson testified that the day of the week was Thursday, that the courts were open, but that he did not go before a judge to obtain an arrest warrant for McBride, even though he knew that a judge was available from whom he could have obtained a warrant.

The detectives went to the defendant's place of employment at 500 South Clinton at 3 p.m., arrested him without a warrant, took him to a police station, chained him to a wall and questioned him.

The detectives did not have sufficient facts to establish probable cause for the issuance of a warrant to arrest Willie McBride or to arrest him without a warrant. The trial court, however, erroneously concluded:

"[B]ased on the nature of the crime, the fact that a weapon was involved, *the fact that the defendant would be leaving work within a short period of time, that they had ascertained where he worked the Court would find* over the defense's objection *that there was probable cause* under all intent and circumstances. Motion to quash the arrest therefore will be respectfully denied." (Emphasis added.)

■ First, the detectives' ascertainment of the defendant's place of employment and the defendant's quitting time on his job, on which the trial court relied, were improper considerations in determining whether there was probable cause that the defendant committed the offense of shooting Diane Neil. Expediency of an arrest is not a factor to be considered in determining if there is probable cause for the arrest.

Second, there is no evidence that the detectives relied on the hour the defendant's workday terminated as a factor in their decision to arrest the defendant. There is no evidence that the detectives even knew that the defendant was at his place of employment when they went there. More importantly, there is no evidence that the detectives knew what time the defendant's workday concluded when they arrested him, and the record is also completely silent on even an inference of flight by the defendant.

The State's theory that the detectives had adequate facts to establish probable cause that McBride shot Diane Neil in a jealous rage be-

cause she was leaving him is simply unsupported by the evidence.

The evidence does not establish that McBride knew that Diane was leaving him or that he objected or even cared if she did. George Neil testified that Diane did not tell him in her telephone conversation on the evening of July 20 that she was having any argument with McBride. Moreover, there is no direct evidence that McBride was in the apartment at 9:46 p.m. when Diane called George Neil and told him that she was packing her clothing in a suitcase and would be leaving in a couple of minutes. On the other hand, if McBride was in the apartment when Diane left, it is difficult to explain how he controlled his rage, allowed her to leave and then released his rage and attacked her 20 minutes later over 17 blocks from the 1111 South Ashland Avenue apartment.

Additionally, the shooting of Diane and her purse and wallet, money and glasses scattered on the floor of the car are not explained by a contention that the shooting was by McBride, a jealous husband in a fit of rage. This explanation does not explain why her personal belongings were scattered on the floor of the car. The suitcase of Diane's clothing, that she told George Neil she was packing and bringing with her, was not found at the homicide scene or in the car and there is no explanation for its absence, a factor which should have been but apparently was not considered by the detectives when they decided to arrest McBride "for investigation."

The evidence on the hearing of the motion to quash the arrest did not establish George Neil's specific address. Detective Peterson testified, however, that George Neil told him during the July 21 interview in Dr. Hammat's office that Diane told him when she called him at 9:46 p.m. on July 20, "that she would be leaving within two minutes and to expect her at his home on the north side." Diane left from 1111 South Ashland ostensibly to go north to George Neil's home. Yet, when McDaniel discovered Diane in her car in the intersection of Elizabeth and Lake Streets, the car was headed in a southwesterly direction, the opposite direction that she supposedly was en route, another factor the detectives were entitled to consider in determining whether to arrest the defendant. There is no evidence, however, that the detectives did so.

In response to the defense counsel's question, "Why did you think you should have arrested Willie McBride on that day?" Detective Peterson stated:

> "Because of the conversation with George Neil, coupled with the fact of the previous encounter between the victim and Willie McBride, this being the aggravated assault, also with the

time span of 9:46 where the victim last spoke with George Neil and her being found or the police being called approximately ten minutes after 10:00 that evening and where she was found was in close proximity of where she was living at 1111 South Ashland. We then proceeded to the printing company and placed Willie McBride under arrest."

This statement by detective Peterson did not constitute a probable cause basis for the defendant's arrest. The trial court did not so find. When asked on oral argument before this court, "What was probable cause in this case?" the State did not rely on and apparently recognized the inadequacy of this answer by Peterson to establish probable cause. The State did not answer the court's question.

The totality of the pertinent facts within the detectives' knowledge when they arrested the defendant on July 21, 1983, at 3 p.m. at his place of employment for investigation of the Diane Neil homicide was simply that on March 2, 1983, the defendant was charged with aggravated battery allegedly arising out of the defendant's having pointed a gun at Diane Neil. Sometime after 9:46 p.m. on July 20, 1983, unknown to her husband, the defendant Willie McBride, Diane Neil left her 1111 South Ashland Avenue apartment, which was provided her by Dr. Hammat, in a car also provided her by Dr. Hammat, and supposedly drove to visit her other husband, George Neil, who lived on the north side of Chicago. About 10:10 p.m. she was discovered mortally wounded from multiple gunshots in the car standing in a southwesterly direction in the intersection of Lake and Elizabeth Streets, practically three miles from her apartment, with her money, purse, wallet and Dr. Hammat's credit cards strewn over the floor of the car. These facts were inadequate to create a valid or justifiable suspicion that the defendant shot Diane Neil.

We conclude, as the detectives stated, that they arrested the defendant for "investigation," that the arrest was without probable cause and was therefore violative of the defendant's constitutional rights under the Federal and State constitutions to be secure in his person against unreasonable seizure. The trial court therefore erred in overruling the defendant's motion to quash his arrest and suppress defendant's statements. Accordingly, we reverse the defendant's conviction and remand the cause for a new trial.

Reversed and remanded.

SULLIVAN, P.J., concurs.

JUSTICE LORENZ, specially concurring:

Probable cause is to be determined by the totality of facts and circumstances known by the arresting officers at the time of the arrest. (*People v. Krogh* (1984), 123 Ill. App. 3d 220, 462 N.E.2d 790.) Detective Stephen Peterson, the officer who admittedly arrested the defendant at his workplace, testified that he possessed the following information at the time of the arrest. At about 10:10 p.m. on July 20, 1983, the victim was found in her car, at the intersection of Lake and Elizabeth in Chicago. She asked for help, saying that she had been shot. The man who found her told Peterson he put the car gear in park and turned off the ignition. Peterson arrived at 10:55 p.m., observing, according to his trial testimony, that other officers had already protected the crime scene. The front passenger window of the car was broken out and the car was facing southwest in the intersection. The victim had been pronounced dead on arrival at the hospital, with three gunshot wounds to her back, one to the front of her neck, and one to the left side of her chest. There was blood on the driver's side of the car. A purse and wallet were on the floor along with some money (described by Peterson at trial as "loose change and some dollar bills") and a lens from a pair of sunglasses. Credit cards and a driver's license bearing the victim's name were still in the wallet. The backseat contained boxes and the trunk contained an "expensive looking briefcase," a styrofoam cooler, and "other property." At 216 North Elizabeth (a location established at trial to be 300 feet north of the car) there was broken auto glass, a pair of sunglasses with a missing lens, and a fingernail. Peterson's stated opinion was that there was no evidence of a robbery at the scene.

The next morning the owner of the car, Dr. Hammat, told Peterson that he last saw the victim at 2:30 p.m. the day of the shooting. He rented a townhouse for the victim at 1111 South Ashland and had also given her the car and some of his credit cards, which were found in her wallet. According to Hammat the victim was married, but was "due to get a divorce."

The victim's husband, George Neil, called Hammat to inquire about her whereabouts while the police were there. He then came to the office and told Peterson that the victim was also presently married to the defendant, but had been having "domestic problems" with the defendant. In March 1983 the victim had defendant arrested for aggravated assault because he pointed a gun at her. (Peterson verified the fact of the arrest by telephone.) Neil stated that the victim planned to leave the defendant and move back in with him. At 8:45 p.m. the night of the shooting he spoke to the victim by telephone at

her Ashland home. (Neil's daughter called, the defendant answered, and the daughter asked for the victim.) The victim told Neil she was planning to leave the defendant and go visit him. At 9:46 p.m. the victim telephoned Neil and said she would be leaving the house within two minutes, so that he should expect her at his house. She also told Peterson, according to a portion of his police report which he read into the record at the hearing, that defendant was still at the house. The victim never arrived at his house. The police telephoned defendant's employer and learned defendant would be working until 4 p.m.

This was the totality of the information known to the police when they arrested the defendant. The most important facts known to the police were that defendant had threatened the victim with a gun four months earlier, that 25 minutes before being found the victim had told her other husband by phone that she was leaving her home and that defendant was still there, and that the victim was found shot approximately 16 blocks from that location. Certainly these facts gave the police reason to be suspicious of the defendant, but mere suspicion is insufficient to establish probable cause. (*People v. Jones* (1959), 16 Ill. 2d 569, 158 N.E.2d 773; *In re Brewer* (1974), 24 Ill. App. 3d 330, 320 N.E.2d 340.) To establish probable cause the facts must be such as to cause a man of reasonable caution to believe that a particular individual has committed a crime. (*People v. Riszowski* (1974), 22 Ill. App. 3d 741, 318 N.E.2d 10.) Based on the facts I have outlined, including the relevant trial evidence (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223), I find that the defendant was illegally arrested upon mere suspicion. For that reason alone I concur with the determination of the majority that defendant's statements, obtained through exploitation of that arrest, were improperly admitted and that his conviction should be reversed and the cause remanded for a new trial.