THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEO DOBBS, Defendant-Appellant.

Second District   No. 2—03—0718

Opinion filed November 22, 2004.—Rehearing denied December 28, 2004.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a bench trial, defendant, Leo Dobbs, was convicted of residential burglary (720 ILCS 5/19—3 (West 2002)) and sentenced to 64 months' imprisonment. On appeal, defendant contends that (1) the trial court erred when it relied upon matters not in evidence in reaching its verdict; (2) he was denied the effective assistance of counsel at trial; and (3) the trial court lacked authority to impose a fine for the Driver's Education Fund (625 ILCS 5/16—104a (West 2002)). We affirm in part and vacate in part.

On January 7, 2003, defendant was charged by indictment with residential burglary (720 ILCS 5/19—3 (West 2002)). The indictment charged that, on or about December 1, 2002, defendant knowingly and without authority entered into the dwelling place of the victim, Maelean Williams, located at 3025 Kentshire Circle, in Naperville, with the intent to commit a theft. Also on January 7, 2003, Selwyn Coleman, defendant's privately retained counsel, filed his appearance.

On April 16, 2003, defendant waived his right to a jury trial. The case proceeded to bench trial that same day. The victim testified that she had met defendant in 2000 and they dated until approximately June 2002, although she had spent the night with defendant as recently as September 2002. The victim testified that, during the

course of their relationship, she owned a town house located at 3025 Kentshire Circle in Naperville, where she lived with her son. While she and defendant were dating, defendant would often spend the night at the town house but he did not live with her. The victim testified that she did not give defendant a set of keys to her town house.

The victim further testified regarding an earlier incident on June 14, 2002, when she was at a rental property she owned in Chicago and defendant arrived to talk to her. The victim testified that defendant went into her car and took her house keys from her purse. She attempted to take the keys back from him but he left. The victim testified that she called the police, and officers came to the town house. Defendant arrived and gave the officers the keys.

The victim testified that on November 28, 2002, she was in Chicago at her rental property. Defendant arrived, wanting to speak with her, but she declined. The victim testified that defendant spoke with her son and learned that she was planning to go to her mother's house in Rantoul. The victim testified that defendant threatened to harm her and her son if he could not accompany them. The victim testified that she allowed defendant to accompany them in her rental car to her mother's house. The victim, her son, and defendant stayed at her mother's house that evening.

The victim further testified that the next day, she and defendant got into an argument because he wanted to stay at a hotel. The victim testified that defendant attacked her, took the keys to the rental car, and left. The victim went to the hospital and then remained in Rantoul for several more days. The victim testified that defendant telephoned her every day after the incident wanting to reconcile.

The victim testified that on December 1, 2002, she returned to her Naperville town house for approximately 30 minutes to retrieve some clothes, then went back to Rantoul to stay with her mother. The victim admitted that she may have forgotten to set her alarm system when she left. The victim acknowledged that a T-shirt and a pair of pants defendant had left in the town house earlier in the year were still in the Naperville town house.

The victim further testified that defendant called her on December 4, 2002, asking her to return home and spend time with him. She testified that, after she told him no, he became upset and told her that he had taken three things from the town house. He told her that she would "find him" when she realized they were gone and that he was going to "ruin" her. The victim testified that defendant called her again the following day, wanting to reconcile. When she said no, defendant told her he was going to kill her and that he could "come home" any time he wanted because he had keys.

The victim testified that she returned to the town house the evening of December 9, 2002. She noticed that the drawers of her nightstand and her closet door were open but she thought she had left them open when she was in the town house on December 1, 2002. That evening, she received a call from the North Riverside police department. She returned the call the next day and learned that they were in possession of her birth certificate, social security card, and checkbook. The victim testified that she looked in her nightstand and closet where she normally kept these items and realized they were missing, as was a diamond tennis bracelet.

The victim further testified that the police had recovered a state identification card and a driver's license, both issued December 6, 2002. She admitted that both of the cards had her photograph on them, but they did not belong to her nor were they ever in her possession. The victim identified a check drafted to Carson Pirie Scott from her checkbook, although she had not issued it. She testified that she did not know Carolyn White, the person whom the police had discovered with the victim's items, did not know why White would have possessed the items, and had not given her permission to do so. The victim further testified that no one else had been given permission to possess them either.

Carolyn White testified that she was an acquaintance of defendant. White testified that, at approximately noon on December 9, 2002, defendant met with her and Nakesha Hargrove, the mother of one of defendant's children. White testified that defendant showed her the victim's identification cards and checkbook, and they discussed going shopping. White testified that defendant gave her the victim's state identification card, driver's license, checkbook, social security card, and birth certificate. White practiced writing the victim's signature, and they all went to the mall. White testified that at Carson Pirie Scott (Carson's) in North Riverside, defendant picked out clothes and gave them to her to purchase.

The State introduced a surveillance videotape and a photograph from Carson's, which showed defendant holding clothes while White was at the counter making purchases. White further testified that she was arrested at Carson's and charged with forgery. At the time of her arrest, White told the police that she and Hargrove had found the victim's identification on the street about four weeks earlier. White testified that she told this story to the police because she was scared at the time. White testified that she pleaded guilty to forgery and received a sentence of 18 months' probation.

Defendant testified on his behalf. He acknowledged that he had two prior felony convictions. Defendant testified that in 2000 he owned

two businesses and was attending college to obtain his accounting degree. That year, he met the victim, began spending nights at her house, and gradually moved in. Defendant acknowledged that he never had a key to her house. Defendant testified that they were engaged to marry and they obtained a marriage license. Defendant testified that he changed his mind about marriage because the victim told him that, if she married him, she did not want to deal with his five children.

Defendant further testified that in October 2002 he and the victim were together in a car at the 3300 block of Madison Street in Chicago. As defendant drove, they were arguing. Defendant testified that he threw a folder belonging to the victim out of the window. He testified that she told him that the folder contained important information, including a birth certificate, a social security card, and a checkbook. Defendant testified that they drove around the block to retrieve the items and found the folder, but the contents were gone.

Defendant further testified that he and the victim spent the night prior to Thanksgiving, November 27, 2002, at the Naperville town house. At that time, they were together as a couple, and their relationship was strong. They left Naperville together around 5 p.m. Defendant testified that the victim set her security alarm when they left the town house. They drove to the victim's mother's house in Rantoul in the rental car.

Defendant testified that on November 29, 2002, he asked the victim for the car keys so he could return to Chicago and be with his children. He testified that the victim was drunk and began hitting and kicking him. Defendant testified that he took the keys and left, without harming the victim. He drove the rental car back to Chicago.

Defendant further testified that, after this incident, he knew that the victim did not want him in the Naperville town house. Defendant denied entering the town house and removing the items. Defendant testified that he spoke with the victim only twice afterward. He testified that he called her and asked for his clothes back. Defendant also denied being involved in the December 9, 2002, incident at Carson's and knowing Carolyn White. Defendant testified that on December 14, 2002, the victim called him and told him he could come to the town house and pick up his clothes. When he met her there, the police arrested him. Defendant testified that he considered himself to be dating her until that time.

In rebuttal, the State called Garron Wright, who testified that on December 9, 2002, he was working as a security guard at Carson's in North Riverside. While he was monitoring the camera system, he observed defendant randomly picking up clothes. He observed defendant give all of the clothes to Carolyn White, who was one of the

two women defendant was with, and leave the store. Wright testified that a photograph and videotape of defendant with White at the cash register were taken via the security system. Wright further testified that Carson's security department verified that the check White presented was stolen and apprehended her leaving the store. Wright recovered two of the victim's identification cards, her social security card, her birth certificate, and her checkbook.

The trial court found defendant guilty. In discussing the evidence, the trial court reflected on the differing testimony presented by the victim and defendant. The trial court also reflected on the evidence as it pertained to defendant's testimony. The trial court stated that the identification card and driver's license could not have been thrown out the window in October 2002 as defendant had testified, because they had not yet been created. It also discussed the method by which one might obtain a driver's license. The trial court stated:

"We know you get a birth certificate, you get a driver's license. What else do you have to have to get a driver's license? You've got to have a picture. ***

This is [the victim's] picture. The picture wasn't in the manila envelope that was thrown out the car window.

Remember what [defendant] said was in the envelope? These three items and some business papers. No pictures.

Where would pictures come from most likely in reasonable people assuming? They come from somebody else's house.

And someone who had familiarity because he had been a guest in that home and might have some familiarity with where certain items were kept. So I see that as a major issue.

These documents were created with these items and with photographs of the victim."

The trial court further reflected on the contents of the checkbook and the individual check White used at Carson's. The trial court noted that the check used at Carson's was number 515, and in the victim's checkbook, check number 501 remained, but the duplicate checks indicated that checks 502 through 513 were used. The trial court noted that these checks were dated December 6 through 9, 2002, and appeared to be written in amounts of $200, $269, $276, $851, $350, $254, $254, $200, and $1,360. The trial court stated, "That's a lot of money that might cause somebody ruin, for example, financial distress, and so that sort of is consistent" with the victim's testimony that defendant told her he would "ruin" her.

On May 19, 2003, defense counsel Coleman filed a motion for a new trial. In the motion, he stated, in pertinent part:

"2. That [Williams's] testimony was difficult to be heard and at times impossible to hear, even though the attorney for the

Defendant, proceeded to try to find a place in the courtroom where he could hear her, but to no avail. The attorney for [defendant] called to and indicated that he could not hear the testimony of *** Williams, but to no avail.

3. That after her testimony the State put on some witnesses, whose testimony could be heard.

\* \* \*

8. That this Defendant's attorney, asks that the trial be repeated, and the complaining witness[ ] be made to speak up so that her testimony, if any, could be challenged.

This defendant *** did not have an attorney who could hear the testimony of the principal complaining witness, and therefore could adequately attach [sic] the testimony of the complaining witness, Maelean Williams, all to the detriment of the Defendant ***."

On May 28, 2003, the trial court conducted a hearing on defendant's posttrial motion. Defense counsel Coleman stated that, although he hated to admit it, "some of it is very true." The trial court found that defense counsel had done a competent job and that defendant was not prejudiced by "a couple of occasions" when defense counsel did not hear properly, and denied the motion. The trial court sentenced defendant to 64 months' imprisonment. Defendant timely appeals.

Defendant presents three issues for review: (1) whether his conviction must be reversed because the trial court relied upon facts not in evidence; (2) whether he was denied the effective assistance of counsel because his trial counsel was unable to hear portions of the testimony; and (3) whether the trial court erroneously imposed a penalty for the Driver's Education Fund that was not statutorily authorized.

As to defendant's first contention, defendant argues that the trial court improperly speculated that the photographs used to obtain a driver's license and state identification card in the victim's name were stolen from her home by someone who had familiarity with where she kept them. Defendant argues that the source of those photographs was not discussed in trial testimony. Defendant also asserts that the trial court improperly concluded that checks 502 through 513 were fraudulently written from the victim's checking account and then used. Defendant notes that the only check discussed in testimony was number 515. Defendant requests that we review this issue for plain error (see 134 Ill. 2d R. 615(a)). Defendant concludes that the trial court's statements show that it considered matters not in evidence when it found defendant guilty of residential burglary.

■ To preserve an issue for appellate review, a defendant must make a timely objection at trial and include the ground for the objection in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186

824

(1988). Here, because the record indicates that defendant failed to object or otherwise call attention to the trial court's statements, either during its ruling or in a posttrial motion, defendant has waived this issue for appeal. However, as previously mentioned, defendant requests that we consider the merits of the issue under the plain error rule, on the ground that the error implicates his fundamental due process rights. See *People v. Rowjee*, 308 Ill. App. 3d 179, 186 (1999).

The plain error rule is a limited exception to the waiver doctrine that permits appellate review in an instance where a reviewing court finds that an error is of such magnitude that the defendant was denied a fair trial or where the evidence is closely balanced. *People v. Beasley*, 307 Ill. App. 3d 200, 208 (1999). Because the issue presented implicates defendant's due process rights and because the State's evidence was primarily circumstantial, we will consider defendant's contention.

■ When conducting a bench trial, the trial court is presumed to consider only admissible evidence. *People v. Harris*, 182 Ill. 2d 114, 156 (1998); *People v. Soteras*, 295 Ill. App. 3d 610, 619 (1998). This presumption is overcome, however, if it affirmatively appears from the record that improper evidence was considered by the court. *People v. Devalle*, 182 Ill. App. 3d 1, 3 (1989), citing *People v. Cepolski*, 79 Ill. App. 3d 230 (1979). A trial court's determination based upon a private investigation or private knowledge, untested by cross-examination or any of the rules of evidence, constitutes a denial of due process of law. *People v. McBride*, 157 Ill. App. 3d 955 (1987).

■ To prove defendant guilty of the offense of residential burglary, the State was required to establish and prove that defendant, knowingly and without Maelean Williams' permission, entered or remained in her town house, or any part thereof, intending to commit therein a felony or theft. See 720 ILCS 5/19—3 (West 2002). The trier of fact bears the responsibility to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

Here, the victim testified that, in a telephone conversation with defendant on December 4, 2002, defendant told her he took three items from her town house and he was going to "ruin" her. The victim also testified that, in a telephone conversation with defendant on December 5, 2002, defendant told the victim that he was going to kill her and that he could "come home" any time he wanted because he had keys. The victim testified that, on December 9, 2002, the drawers of her nightstand and her closet door were open. The following day, the victim checked her answering machine and received a message from the North Riverside police department. Upon calling the police

department, she was informed that the police were in possession of her birth certificate, social security card, and checkbook. The victim confirmed that her birth certificate and social security card were missing from her nightstand and that a book of checks was missing from her closet. Among other items, the State introduced into evidence an Illinois driver's license, duplicate type, issued December 6, 2002, and bearing the victim's photograph; an Illinois identification card, duplicate type, issued December 6, 2002, and bearing the victim's photograph; and a blue checkbook holder containing a check register and a book of checks. The victim identified the photographs of herself on the duplicate driver's license and duplicate identification card but testified that the documents were not issued to her and were never in her possession.

We believe that all of the trial court's comments were proper inferences based on the evidence presented. In assessing the credibility of the witnesses, the trial court rejected defendant's version of the events. It noted that the duplicate driver's license and the duplicate identification card could not have been thrown out of the car window in October 2002 because they were not yet in existence, as they were issued December 6, 2002. The trial court noted that the duplicate license and state identification card bore the victim's photograph, and it correctly deduced that, in order to have these items created, one would need a photograph. In discussing where "reasonable people" would obtain a photograph for that purpose, the trial court made a proper inference from the evidence presented that the photograph would come from someone's home. The trial court also made a proper inference from the victim's testimony as to where she kept her birth certificate and social security card, that someone who had some familiarity with the home and its occupants might have some knowledge of where those documents were located. Based on these proper inferences, the trial court concluded that the duplicate driver's license and duplicate state identification card were created with the birth certificate, social security card, and photographs of the victim. We find no error.

We also believe that the trial court's comments with respect to the individual checks contained in the victim's checkbook were based on the State's evidence presented and were, therefore, proper. The victim testified that she was using checks numbered in the 300s, and the book of checks reflecting numbers 501 through 530 was kept in her "closet on a shelf in a box." The victim also testified that, during a telephone conversation on December 4, 2002, defendant told her he was going to "ruin" her. The State also presented evidence that, on December 9, 2002, defendant gave Carolyn White the victim's identification cards and checkbook, and they later went to Carson's

together, where White attempted to purchase items that defendant gave her.

The State introduced the victim's blue checkbook holder, which contained a check register and a book of checks. The checks in the book were numbered from 501 through 530. Following each numbered check was carbon-type paper, which appeared to reproduce whatever was written on the numbered check. Checks number 502 through 508, 510, 512, 513, and 515 were missing, but the carbon paper reflected what had been written on the checks. Check numbered 511 and its carbon paper were altogether missing from the book. The State also introduced into evidence check number 515, which was dated December 9, 2002, and made payable to Carson's in the amount of $387.85. We note that the carbon paper in the checkbook also reflected what was written on check number 515.

All of the trial court's comments regarding the contents of the checkbook were proper inferences based on what the State placed into evidence. The carbon paper in the checkbook reflected that check number 502 appeared to be dated December 9, 2002, and written for approximately $200. The carbon paper corresponding with check number 503 appeared to be dated December 9, 2002, and written for approximately $269. The carbon paper corresponding with check number 504 appeared to be dated December 9, 2002, made payable to "Leather images," and written for approximately $276. The carbon paper corresponding with check number 505 appeared to be dated December 9, 2002, made payable to "Marshall Fields," and written for approximately $851. The carbon paper corresponding with check number 506 appeared to be dated December 9, 2002, made payable to "Nordstrom," and written for approximately $350. The carbon paper corresponding with check number 507 appeared to be written for approximately $254. The carbon paper corresponding with check number 508 appeared to be dated December 9, 2002, and written for approximately $254. The carbon paper corresponding with check number 510 appeared to be dated December 9, 2002, made payable to "Marshall Fields," and written for approximately $254. The carbon paper corresponding with check number 512 appeared to be dated December 9, 2002, made payable to "Circuit City," and written for approximately $2,130. The carbon paper corresponding with check number 513 appeared to be dated December 6, 2002, made payable to "Carolyn White," with a memo reflecting "Rental Deposit," and written for $1,360. The trial court commented on the numbered carbon papers that corresponded with the numbered checks. Contrary to defendant's assertions, the trial court did not find that the checks were fraudulently written—it simply found the evidence "interesting." The trial

court properly inferred from this evidence that the checks "might" cause somebody "ruin" or "financial distress," and noted that the State's evidence was consistent with the victim's testimony that defendant was going to "ruin" her. Based on our review of the record, we find that the trial court clearly considered only competent evidence.

Defendant's cited authority on this issue is distinguishable. In *People v. Wallenberg*, 24 Ill. 2d 350 (1962), after a bench trial, the defendant was convicted of robbery. The defendant stated that his alibi for the time of the robbery was that he was looking for, but could not find, a gas station in a particular part of the City of Chicago. The trial court, in finding the defendant guilty, stated that it knew for a fact that there were gas stations on the particular stretch of road the defendant described. Our supreme court held that it was error for the trial court to make a determination based on its personal knowledge. *Wallenberg*, 24 Ill. 2d at 354.

■ In this case, however, the trial court did not improperly consider evidence based on its personal knowledge but rather considered all the evidence presented and the inferences therefrom. Thus, *Wallenberg* has no application to the facts in this case. Therefore, for the above reasons, we see no reason to disturb the trial court's judgment.

■ Defendant's second contention is that he was denied the effective assistance of counsel because his trial counsel admittedly was unable to hear the victim's testimony. The standard for determining whether defense counsel was ineffective is well established. Generally, a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result of counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (adopting *Strickland*). With respect to the performance prong, a defendant must demonstrate that his counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have proceeded differently is sufficient to establish ineffective assistance of counsel. *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995).

Appellate counsel states in defendant's brief that he could not locate any authority specifically addressing the effectiveness of trial counsel who is impaired to the extent counsel is unable to hear portions of a trial. Defendant then analogizes the circumstances in the present case to those in *Javor v. United States*, 724 F.2d 831 (9th Cir.

828

1984). In *Javor*, the defense counsel not only slept during the trial, but he also failed to participate when evidence against his client was being presented. *Javor*, 724 F.2d at 834. The *Javor* court recognized that, "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary." *Javor*, 724 F.2d at 833. We also note that, in *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001), counsel was deemed ineffective because he slept through a portion of a capital trial. *Burdine*, 262 F.3d at 349. However, the *Burdine* court did not adopt a *per se* rule but, rather, limited its holding to the "egregious" facts of the case. *Burdine*, 262 F.3d at 349.

We recognize *People v. Dean*, 28 Ill. App. 3d 196 (1975), where the reviewing court rejected a claim of ineffective assistance of counsel under a set of circumstances more egregious than in the present case. In *Dean*, the defendants, who were represented by privately retained counsel, were convicted of the offense of rape (Ill. Rev. Stat. 1963, ch. 38, par. 11—1) and each was sentenced to a term of 40 to 60 years' imprisonment. *Dean*, 28 Ill. App. 3d at 197. In their second amended postconviction petition, they alleged they were entitled to a hearing based on, *inter alia*, their privately retained trial counsel's incompetence. *Dean*, 28 Ill. App. 3d at 197. Attached to the petition was an affidavit of the retained trial attorney's son, himself an attorney who had attended portions of the defendants' trial, who stated that, around the time of the trial, his father had shown signs of general deterioration and was found to be a diabetic and to have arteriosclerosis. *Dean*, 28 Ill. App. 3d at 198. Also attached to the petition was an affidavit of the attorney's layman assistant, who stated that counsel was nearly blind, hard of hearing, and suffered from diabetes and bladder stones, and that counsel's physical impairments and handicaps precluded proper representation. *Dean*, 28 Ill. App. 3d at 198. The trial court denied the defendants' petition without an evidentiary hearing. *Dean*, 28 Ill. App. 3d at 197.

The reviewing court affirmed the trial court's denial of the petition. *Dean*, 28 Ill. App. 3d at 201-02. The reviewing court, using the "farce" test (*People v. McNeil*, 53 Ill. 2d 187 (1972)), concluded that the defendants failed to establish that counsel's infirmities prevented him from representing them in a reasonably professional manner. *Dean*, 28 Ill. App. 3d at 199-201. The reviewing court considered significant that (1) counsel's son made no statement in his affidavit that his father's ailments interfered with proper representation, and (2) the layman's affidavit declared that counsel's ailments did not visibly appear to affect his mental acuity. *Dean*, 28 Ill. App. 3d at 200.

In recognizing *Dean*, however, we must also recognize the

subsequent federal *habeas corpus* proceeding, where the federal court concluded that the defendants had been denied the effective assistance of counsel. See *United States ex rel. Castleberry v. Sielaff*, 446 F. Supp. 451, 454-55 (N.D. Ill. 1978). In that proceeding, the federal court clearly considered the then 72-year-old trial attorney's physically deteriorating condition to be significant, pointing out that, *inter alia*, there were numerous instances during the trial where counsel asserted his inability to hear the witnesses and the prosecutor's closing argument. *Castleberry*, 446 F. Supp. at 453-54.

In the present case, employing the *Strickland* standard, we determine that defense counsel Coleman's performance did not fall below an objective standard of reasonableness. Our review of the record shows that defense counsel explored the substance of the victim's direct examination testimony in a thorough cross-examination, which comprised nearly 21 pages of transcript, and in a re-cross-examination, comprising an additional 2 pages of transcript. Although defense counsel admitted to the court at the conclusion of the State's direct examination of the victim, "I don't think I heard 10 percent of what the witness testified to," he then continued, "so I'll have to repeat everything." Defense counsel then engaged in an extensive question-and-answer examination with the victim, oftentimes repeating her response as if he were inquiring whether what he heard was correct, and the victim would then respond in the affirmative or correct him. In defendant's posttrial motion, defense counsel complains that he could not hear only the victim's testimony. Defense counsel acknowledges that he could hear the other witnesses. We do not believe that defense counsel's inability to hear one witness, while acknowledging the ability to hear other witnesses, can at any objective level be considered "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

In so holding, we must also recognize that in *People v. Coss*, 45 Ill. App. 3d 539 (1977), the reviewing court reflected the policy concern that allowance of an ineffective representation claim might induce collusion between an accused and his lawyer to purposely commit an error in the hope of procuring reversal of an adverse disposition. Courts must guard against trial attorneys' intentionally feigning incompetence. See *People v Ortiz*, 22 Ill. App. 3d 788 (1974). In the present case, we do not believe that defendant raised this issue for an improper purpose. Defendant, however, does not identify any evidence that should have been challenged or objected to, and he does not point to a topic or line of questioning that defense counsel failed to inquire about on cross-examination. As a result, we conclude that defendant has

failed to show that he was prejudiced by counsel's admitted hearing impairment. The trial court properly denied defendant's posttrial motion, and we determine here that defendant was not denied the effective assistance of counsel.

■ Last, defendant contends that the fine levied against him for the Driver's Education Fund (625 ILCS 5/16—104a (West 2002)) should be vacated. Defendant argues that the penalty was not statutorily authorized, and the State confesses error. We agree with defendant, and we vacate that portion of defendant's sentencing order assessing the penalty.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

BOWMAN and CALLUM, JJ., concur.