THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES SMITH *et al.*, Defendants-Appellants.

First District (4th Division) No. 1—85—0782

Opinion filed June 16, 1988.—Rehearing denied July 28, 1988.

Steven Clark, Julie B. Aimen, and Alan D. Goldberg, all of State Appellate Defender's Office, of Chicago, for appellant James Smith.

Paul P. Biebel, Jr., Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant Dexter Bailey.

Mark D. DeBofsky, of DeBofsky & DeBofsky, of Chicago, for appellant Earl Miller.

Mary Ellen Dienes, of Chicago, for appellant Fred Williams.

Richard H. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Lynda A. Peters, and Rena M. David, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendants, James Smith, Dexter Bailey, Earl Miller and Fred Williams, were convicted of several offenses arising from a home invasion and armed robbery which occurred on the South Side of Chicago on January 24, 1984. They were tried jointly; Bailey, Smith and Williams by jury and Miller by the court. Dexter Bailey was sentenced to 20 years on each of two counts of home invasion, 15 years for residential burglary, 15 years each on two counts of armed robbery and an extended term of 10 years for aggravated battery. James Smith and Earl Miller received sentences of 15 years on each of two counts of home invasion, 10 years for residential burglary, 10 years on each of two counts of armed robbery and five years for aggravated battery. Fred Williams was sentenced to 15 years on each home invasion count, 10 years for residential burglary and 10 years on each of two counts of armed robbery; Williams was acquitted of aggravated battery.

The defendants have raised the following issues on appeal: (1) Bailey, Smith and Williams contend that the trial court erred in denying their motions for severance; (2) Miller claims that his arrest, identification and statement to the police should have been suppressed on the grounds that they were the direct result of Bailey's illegal arrest; (3) Bailey and Smith contend that the trial court improperly limited cross-examination into the bias and motive to testify falsely of certain police officers; (4) Williams claims that the trial court erred in denying his motion for a directed verdict and that he was not proved guilty beyond a reasonable doubt; (5) Miller and Williams contend that they received ineffective assistance of counsel; (6) Bailey and Smith maintain that their sentences for home invasion were improper because the trial court placed home invasion in a "super X category," thus ignoring the classification set by the legislature and indicating that a minimum sentence would never be imposed; (7) Smith, Williams and Miller contend that their sentences

were excessive in light of their potential for rehabilitation; and (8) the defendants contend that their convictions on two counts of home invasion and residential burglary violated the principle of "one act, one crime."

At approximately 9 p.m. on January 24, 1984, three men subsequently identified as Dexter Bailey, James Smith and Earl Miller broke into a house at 5521 South Damen Avenue in Chicago. The house was occupied by 54-year-old Sylvia Galuszynski and her 83-year-old mother, Isabelle Galuszynski. According to the State's theory at trial based upon the statement of Fred Williams, Williams also participated in the offense by remaining outside and acting as a lookout. During the course of the home invasion, Sylvia Galuszynski was threatened at gun point, Isabelle Galuszynski was beaten and several items, including cash, jewelry and a television set, were removed from the house.

Each of the defendants made a pretrial statement implicating himself in the crime as well as certain of the codefendants. The State informed the court prior to trial that it intended to introduce the statements at the joint trial as evidence against their respective makers. All four defendants made motions for severance on the grounds that their sixth amendment right to confront and cross-examine the witnesses against them would be violated if the nontestifying codefendants' statements were introduced at the joint trial. The trial court denied the motions based on its finding that the statements were interlocking and therefore admissible in a joint trial as long as the jury was properly instructed that each statement would be considered only against its maker.

Sylvia Galuszynski testified at trial that shortly after retiring for the night, she and her mother heard someone pounding on a basement window. Sylvia called the police and five minutes later heard the front-door doorbell ring. Believing that it was the police, Sylvia opened the door. However, upon seeing a young black man who was not in uniform, she slammed the door shut.

Sylvia then turned on the lights and went downstairs to check out the basement. She observed that the basement window was intact and nailed shut. As she walked up the stairs, the window was forced open and a man whom Sylvia identified as Dexter Bailey jumped into the basement armed with a gun. Bailey put his arm around Sylvia's neck, placed the gun to her head and threatened to kill her. He kept asking her who else was in the house. Two other men, later identified as James Smith and Earl Miller, entered through the basement window. Bailey motioned Smith and Miller to

go upstairs, then followed, dragging Sylvia at gun point. They entered the kitchen, where Isabelle Galuszynski was seated in a rocking chair.

Bailey waived Smith and Miller toward the front of the house, then put the gun to Isabelle's head and threatened to kill her unless she told him where to find the money. Sylvia testified that the kitchen was well lit and that she had a very good opportunity to view the offenders. Bailey went into Isabelle's bedroom, found some jewelry and emptied out the dresser drawers. Bailey returned to the kitchen and again threatened the women, demanding more money. At that time, James Smith stuck his head into the kitchen, and Sylvia offered to give him money. She then gave him $7 in bills and $2 in quarters. Sylvia was able to observe Earl Miller in the living room near the television set.

Suddenly, Isabelle began running as fast as she could toward the front door. Bailey ran out of the bedroom, grabbed Isabelle by the neck and lifted her off the floor. He choked, kicked and beat Isabelle with a gun for several minutes, then threw her back down into the rocking chair. Bailey returned to Isabelle's bedroom and removed an envelope containing $2,000 in cash from a purse in the closet. Smith and Miller carried the television set through the kitchen and called to Bailey to leave. When Bailey went to the back door to talk to Smith and Miller, Sylvia pushed him out and locked the door. She then called her brother, who alerted the police. Sylvia testified that the entire incident lasted between 20 and 30 minutes.

On the following day, Sylvia identified Bailey's picture from a photographic array and a few days later identified him in a lineup. She also made lineup identifications of Smith and Miller and in-court identifications of all three of the offenders who entered her home.

On January 30, 1984, police officers observed Dexter Bailey at 57th and Indiana. When Bailey saw them, he ran and the officers gave chase. According to Officer Thome's testimony, an unmarked police car which was involved in the chase pulled up and stopped in front of Bailey, causing Bailey to run into the car. While at the police station, Bailey gave police the names of James Smith and Earl Miller, then made a statement implicating himself as well as Smith and Miller in the crime. This statement was introduced at the joint trial as evidence against Bailey. In order to avoid prejudice to the co-defendants, however, the statement was redacted to eliminate the name of James Smith. The method of redaction was to insert a blank line wherever James Smith's name appeared in the written statement. When reading the statement to the jury, the assistant State's

Attorney used the term "white out" wherever a blank line appeared. It is clear, however, that the jury was earlier informed through the testimony of a police officer that Bailey had implicated Smith and Miller. On cross-examination of the officer, Fred Williams' attorney elicited testimony emphasizing that Bailey's statement implicated Smith and Miller, and not Williams. Miller's name was not redacted because he had chosen a bench trial. The jury could only conclude, then, that the blank lines stood for James Smith. Because redaction under the circumstances was clearly ineffectual, it is necessary to consider Bailey's unredacted statement in determining its impact upon his codefendants.[1]

Bailey stated that he went to Earl Miller's house at 6 p.m. on January 24, 1984. Smith joined them approximately two hours later, and Bailey showed Miller a nickel-plated .22 caliber derringer with a pearl handle. Bailey then said that he knew where two old ladies lived and he, Smith and Miller went to 5521 South Damen to break into the house. Smith and Bailey went to the rear basement window. Miller stayed in front, then came to the rear. Smith forced open the basement window and Bailey saw an old lady come downstairs. Bailey, armed with a gun, jumped through the window and grabbed the old lady. They took her upstairs and found another old lady in the house. Smith and Bailey asked the first lady for money. She gave them $7, then got $25 from her mother and gave that to the men. The older lady went toward the front door and Smith and Bailey grabbed her. Bailey took her back to the kitchen, then he and Smith searched the house. Bailey took a gold ring and a watch. Earl Miller took a color television and put it in the back. They left the house because Miller had seen an old man and they heard a dog barking. They had been in the house for 20 to 25 minutes. They walked back to Miller's house, taking turns carrying the television set.

At trial, Bailey presented an alibi defense through his own testimony and that of his girlfriend, Michelle Chapman. Bailey stated that he ran when he saw the police officers because he had outstanding traffic warrants and a pending marijuana case. According to

---

[1] Two recent Illinois Supreme Court cases, *People v. Cruz* (1988), 121 Ill. 2d 321, 521 N.E.2d 18, and *People v. Hernandez* (1988), 121 Ill. 2d 293, 521 N.E.2d 25, have held that redaction is ineffectual where the nature of the redactions and the information given to the jury make it "impossible for the jury to conclude that the persons to whom [the defendant] referred were anyone other than the two men seated next to him in the courtroom." (*Cruz*, 121 Ill. 2d at 331, 521 N.E.2d at 23.) It should be noted that the State in this cause makes no serious argument that the redactions were sufficient in light of *Cruz* and *Hernandez*.

Bailey, the police car was moving when it hit him, and he was injured and in pain when questioned at the police station. He testified that the police beat him and coerced him into signing the statement, which he could not read.

Based on the information given to them by Bailey, the police arrested Earl Miller and James Smith. Smith made a statement implicating himself, Dexter Bailey and Earl Miller. Smith's statement was redacted to omit the name of Dexter Bailey, leaving a blank line in place of Bailey's name. However, the jury was earlier informed through a police officer's testimony that James Smith had implicated Dexter Bailey and Earl Miller, but not Fred Williams. As discussed above with reference to Bailey's statement, redaction under these circumstances is ineffectual.

According to the statement in its unredacted form, Smith went to Earl Miller's house on the evening of January 24, 1984. Bailey, who was already there, showed Smith the derringer. They left the house and Bailey said he knew of an easy mark, a house where two old ladies lived. Bailey, Smith and Miller walked to the house and discussed breaking in. They tried the side basement window and saw that the lights were on. Earl Miller went to the front door, then returned and said someone was in the house. A lady came downstairs to the window. Bailey, with a gun in his hand, jumped in and grabbed the lady. He asked her who else was in the house, and they all went upstairs. An older lady was in the house and they took her into the kitchen. Smith stayed in the kitchen to watch the two ladies while Bailey and Smith checked the house. The older lady went toward the front door. Smith followed her, but Bailey grabbed her and took her back into the kitchen. Bailey and Miller then searched the house. After 20 to 30 minutes, Smith and Miller left. Miller was carrying a television set. They went to Miller's house, where Bailey gave Smith $7 as his part of the proceeds. Smith's defense at trial was mistaken identity.

Earl Miller made a pretrial statement implicating himself and codefendants Bailey, Smith and Williams. Miller was the only codefendant who implicated Williams in the offense. Because Miller chose a bench trial, his statement was not read to the jury. Prior to trial, Miller made a motion to suppress his arrest, identification and statement on the grounds that they were the direct result of the unlawful arrest of Dexter Bailey.

Based on the information in Miller's statement, the police arrested Fred Williams. Williams gave a statement to the police implicating himself, Bailey, Smith and Miller. At trial, Williams' attorney

argued that the statement attributed to Williams was so perfect in establishing the elements of the offenses charged that it could only have been fabricated by the State. To support this theory, defense counsel repeatedly emphasized both in cross-examination of the State's witnesses and during closing argument that neither Bailey nor Smith had implicated Williams in his statements to the police. At one point, however, a police officer stated on direct examination that he told Williams that his codefendants had implicated him. Before being introduced into evidence, Williams' statement was redacted to eliminate the names of both Bailey and Smith. Because two names were redacted, Williams' statement will be summarized in its redacted form.

Williams went to Earl Miller's house on the night of January 24, 1984, where he met some other individuals. — said he knew a house they could all break into. — said two elderly ladies lived there. He told the others that they should check it out, and they all went to 5521 South Damen. — pointed out the house and Miller and (deleted names) went to the back of the house. They were going to break in from the back. Williams could see the kitchen light on and went to a store next door where he bought pop and potato chips. When he came out of the store, he stood by some bushes between the store and the ladies' house. He could see .Miller, who was standing, and (deleted names) who were stooping. Miller went to the front and rang the doorbell, while Williams walked to the alley alongside the store. — met Williams in the alley. — asked Miller if anyone was at home. — and Miller went from the alley to the back of the ladies' house. Williams heard the lady hollering and heard — tell her to be quiet. (Deleted names) and Miller were then inside the basement. Williams was then at the back of the house and saw — open the back door. — handed Williams the television set. Williams told Miller that a man with a dog had seen him and that they had better leave. Miller ran into the house to tell —. They took turns carrying the television set to Miller's house, where — emptied his pockets. Williams saw some money and ladies' jewelry. — gave each of them $7. Then Williams saw the gun that — had used. It was a small derringer which Williams had seen — holding earlier when they had discussed the robbery.

On cross-examination of two of the police officers, defense counsel attempted to ask questions about the police department's apparent failure to respond to Sylvia Galuszynski's call to 911. The trial court sustained objections to these questions.

The facts concerning the sentencing hearing will be summarized

later in connection with our discussion of the sentencing issues raised by the defendants.

We will first address the contention of Bailey, Smith and Williams that the trial court committed reversible error in denying their motions for severance.

■ The general rule is that defendants who are jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Bean* (1985), 109 Ill. 2d 80, 92, 485 N.E.2d 349.) One form of prejudice which may occur in a joint trial surfaces where the State introduces the pretrial statement of a nontestifying codefendant which implicates the defendant in the offense.[2] The statement is admissible against the codefendant who made it, but not against the defendant. Because the defendant cannot call the codefendant to the stand for cross-examination, the defendant's sixth amendment right to confront and cross-examine the witnesses against him will be violated. *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

Prior to *Bruton,* the United States Supreme Court had held that this type of encroachment on the right to confrontation could be avoided by instructing the jury that the statement could be considered as evidence only against the nontestifying codefendant who made it and not against the defendant. (*Delli Paoli v. United States* (1957), 352 U.S. 232, 1 L. Ed. 2d 278, 77 S. Ct. 294.) In *Bruton,* the Court overruled *Delli Paoli* and held that a limiting instruction to the jury is insufficient to ensure that a statement admissible against the codefendant who made it will not be considered against the defendant. In doing so, the Court stated that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Bruton,* 391 U.S. at 135, 20 L. Ed. 2d at 485, 88 S. Ct. at 1627.) The Court also recognized that "[n]ot only are the incriminations devastating to the defendant but their credibility is inevitably suspect *** given the recognized motivation to shift blame onto others." (*Bruton,* 391 U.S. at 136, 20 L. Ed. 2d at 485, 88 S. Ct. at 1628.) The Court reasoned that under these circumstances, the need to test the reliability of the statement through

[2]Obviously, in a joint trial all defendants are "codefendants." However, for purpose of clarity, the person moving for severance will be called the "defendant," while the nontestifying codefendant who made the incriminating pretrial statement will be called the "codefendant."

cross-examination is especially great. It therefore held that the confrontation clause violation was fatal and accordingly reversed the defendant's conviction.

Following *Bruton,* a plurality of the Court in *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, held that *Bruton,* did not require reversal of a defendant's conviction where the defendant himself has confessed and his confession "interlocks" with and supports the statement of the nontestifying codefendant. The Court reasoned that where the defendant has confessed and his confession is properly admitted as evidence against him, his case has already been devastated. Thus, the codefendant's statement will seldom have the devastating effect upon the defendant's case which was envisioned in *Bruton* and impeachment of that statement through cross-examination would not be very advantageous.

The *Parker* decision was overruled in *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714. The *Cruz* Court disagreed with the reasoning in *Parker* that a codefendant's statement which "interlocks" with the defendant's own confession will not have a prejudicial effect upon the defendant's case. The Court stated that in many instances, a defendant who confessed or gave a statement before trial will try to disavow the statement by claiming, for example, that it was inaccurately reported or that it was not really true when made. In that case, "a [nontestifying] codefendant's confession that corroborates the defendant's confession significantly harms the defendant's case, whereas one that is positively incompatible gives credence to the defendant's assertion that [the defendant's] own alleged confession was nonexistent or false." (*Cruz,* 481 U.S. at 192, 95 L. Ed. 2d at 171, 107 S. Ct. at 1718.) *Cruz* held that where a nontestifying codefendant's confession incriminates the defendant, the confrontation clause bars its admission at their joint trial even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him.[3] The Court recognized, however, that the impact of the defendant's own confession may be assessed in determining whether the confrontation clause violation was harmless beyond a reasonable doubt. The *Cruz*

---

[3]In another case decided the same day as *Cruz,* the Court held that no confrontation clause violation occurs where the codefendant's statement is redacted to eliminate any reference to the defendant. (*Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702.) As discussed earlier, however, the attempts at redaction in the case at bar were clearly ineffectual under the holdings of *Marsh* and the recent Illinois Supreme Court cases of *People v. Cruz* (1988), 121 Ill. 2d 321, 521 N.E.2d 18, and *People v. Hernandez* (1988), 121 Ill. 2d 293, 521 N.E.2d 25.

Court also stated that where a nontestifying codefendant's statement is supported by sufficient "indicia of reliability," it may be directly admissible against the defendant despite the lack of opportunity for cross-examination. (*Cruz*, 481 U.S. at 193-94, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719, citing *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.) However, because our resolution of the severance issue does not turn on whether the statements of the nontestifying codefendants were shown to possess sufficient independent indicia of reliability, no further discussion of this concept is necessary.

■ Assuming the defendants' motions for severance should have been granted, the trial court's failure to do so was harmless beyond a reasonable doubt. *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.

Earl Miller, who chose a bench trial, does not raise the severance issue on appeal. Because he was tried by the court, his statement implicating Bailey, Smith and Miller was not read to the jury and could therefore not have prejudiced them.

With respect to Dexter Bailey, the record shows that he was positively identified by the victim in a photographic array, a lineup and in court. The victim testified that she was able to observe him at a close distance under good lighting for much of the 20 to 30 minutes that he was in her home. She described how he jumped in through her basement window, threatened her with a gun, took her upstairs, demanded money and searched the house. She stated that she gave Bailey and the others $7 and that it was Bailey who grabbed her elderly mother as she ran for the door. She observed Bailey as he took jewelry from the bedroom and finally pushed him out the back door when he went to talk to the codefendants, who had carried out a television set. Bailey's description of the offense in his pretrial statement, which was properly admitted against him at trial, coincided almost completely with the testimony of the victim. He stated that he jumped through the basement window armed with a gun, grabbed the old lady and took her upstairs, where they found another old lady. They demanded money and the first lady gave them $7, then gave them more money which she obtained from her mother. When the older lady ran toward the door, Bailey and Smith grabbed her. Bailey took a gold ring and a watch and left after Miller, who had taken the television set, said there was someone in the vicinity. Bailey stated that they were in the house for 20 to 25 minutes. Bailey's defense at trial was alibi. The statements of codefendants Smith and Williams, which were almost identical to Bailey's statement, were introduced as evidence against them and because they did not testify

Bailey did not have an opportunity to impeach them through cross-examination. However, given the positive identification testimony of the victim and the fact that Bailey's statement, which was properly admitted against him, coincided in all material respects with the victim's description of the events, any confrontation clause violation was harmless beyond a reasonable doubt.

With respect to James Smith, a similar analysis leads to the same conclusion—that any violation of his right to confront and cross-examine his codefendants about their statements was harmless beyond a reasonable doubt. Smith was also positively identified by the victim, who observed him at close range several times during the incident. His pretrial statement, properly admitted against him at trial, coincided with the victim's testimony regarding the method and point of entry, the incident where the mother attempted to escape, the search of the house, the manner in which the offenders existed, the fact that a television was taken and the length of time they were in the house. Smith also stated that he was given $7 as his part of the proceeds. Smith's defense was mistaken identity. The statements of Bailey and Williams, who did not testify, were very similar to Smith's statement and were admissible as evidence against their respective makers. As with Bailey, however, the positive identification testimony of the victim as well as the fact that Smith's statement, which corroborated the victim's testimony, was properly admissible as evidence against him leads to the conclusion that any confrontation clause violation was harmless beyond a reasonable doubt.

The situation with respect to Williams is somewhat different. Williams never entered the house and was not identified by the victim. The only codefendant who implicated Williams was Miller, whose statement was not read to the jury. Although Williams' attorney argues that the blank lines in the redacted statements of Bailey and Smith could have led the jury to erroneously conclude that Williams had been implicated, the record does not support his argument. One of the officers who testified at trial stated that Bailey had implicated Smith and Miller and that Smith had implicated Bailey and Miller. On cross-examination and in closing argument, Williams' attorney repeatedly emphasized that neither Smith nor Bailey had implicated Williams in their statements. At one point, a police officer stated that he told Williams that his codefendants had implicated him. However, when the statements were subsequently read to the jury, Williams' attorney established on cross-examination that neither Smith nor Bailey had implicated Williams. Because the statements of the nontestifying codefendants had not implicated Williams, he suffered

no prejudice as a result of their admission at the joint trial.

■ Williams also contends that his motion for severance should have been granted because his defense was antagonistic to that of Dexter Bailey. Severance is required when the defenses of codefendants are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others. (*People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349.) The defendant moving for severance must establish how he would be prejudiced by a joint trial; mere apprehensions of prejudice are not enough. *People v. Bean,* 109 Ill. 2d 80, 485 N.E.2d 349.

■ In the case at bar, Williams contends that his defense of non-involvement was antagonistic to Bailey's alibi defense. He maintains that he was prevented from taking the stand because he may have given testimony about meeting Bailey and the other codefendants on the night of the offense, thus prejudicing Bailey. This argument appears to be based on speculation and does not establish the type of actual prejudice to Williams which would require reversal of the cause for separate trials.

■ We will next consider Earl Miller's contention that his arrest, identification and statement should have been suppressed as the fruit of Dexter Bailey's illegal arrest. In the recent case of *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998, *cert. denied* (1988), 484 U.S. 1045, 98 L. Ed. 2d 866, 108 S. Ct. 780, the Illinois Supreme Court held that a defendant whose own arrest was legal lacked standing to challenge the legality of a codefendant's arrest. The court stated that "a claim to suppress the product of a fourth amendment violation can be asserted 'only by those whose rights were violated by the search or seizure itself.' Since the defendant's own rights were not violated, he may not vicariously seek suppression of evidence as a remedy for such a violation of another's fourth amendment rights." (*James,* 118 Ill. 2d at 226, 514 N.E.2d at 1003.) Miller accordingly lacked standing to raise this issue.

■ Next, Dexter Bailey and James Smith contend that the trial court improperly limited cross-examination of certain police officers concerning the apparent failure of the police to respond to Sylvia Galuszynski's call to 911 when she first heard pounding on the basement window. The police responded approximately an hour later, after having been called by Sylvia Galuszynski's brother. The defendants argue that cross-examination in this area would have shown that the police were under great pressure to solve the crime quickly, thus giving them a motive to testify falsely.

Although wide latitude should be permitted in cross-examining

witnesses as to bias, interest or motive to testify falsely (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 29, 452 N.E.2d 857), the scope of cross-examination rests largely within the sound discretion of the trial court (*People v. Hinton* (1984), 122 Ill. App. 3d 89, 95, 460 N.E.2d 791). A defendant seeking reversal of a trial court's decision in this regard must prove that the court clearly abused its discretion and that the abuse of discretion resulted in manifest prejudice to him. *People v. Hinton,* 122 Ill. App. 3d 89, 460 N.E.2d 791.

■ We believe that in the case at bar, the trial court could have properly concluded that the questioning about the police department's failure to immediately respond to the 911 call was too remote and speculative to bear upon the officers' credibility. Furthermore, given the positive identification of both Bailey and Smith by the victim, we do not believe that manifest prejudice has been shown.

■ Next, Fred Williams contends that his motion for a directed verdict should have been granted because the State presented no evidence to corroborate Williams' admission that he was involved in the crime.

In order for a conviction based on a confession to be sustained, the confession must be corroborated. (*People v. Neal* (1985), 111 Ill. 2d 180, 194, 489 N.E.2d 845, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292.) To satisfy the corroboration requirement, there must be some independent evidence tending to prove that an offense occurred and corroborating the facts contained in the confession. (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 738, 467 N.E.2d 1037.) As stated in *People v. Willingham* (1982), 89 Ill. 2d 352, 360, 432 N.E.2d 861, 865, "there must be some evidence, apart from the confession, demonstrating that a crime occurred. Once the required showing has been made, the circumstances along with the confession may be considered in determining whether the *corpus delicti* is sufficiently proved (as well as the guilt of the defendant)."

■ In the case at bar, there was no question as to whether a crime had occurred; the question was whether Williams was involved in it. In his statement, Williams stated that he and the others intended to break into the residence of two elderly ladies. He gave the approximate time of the offense, the location, and stated that a handgun was used. The details of his statement also corroborated that a television set was removed from the house through the back door and that jewelry and money were taken. All of this was proved independently through the testimony of Sylvia Galuszynski. Therefore, we believe that there was sufficient independent evidence to corroborate the facts of Williams' statement and that his motion for

a directed verdict was therefore properly denied.

██ Williams also argues that the State failed to prove him guilty beyond a reasonable doubt of home invasion, residential burglary and armed robbery because the evidence failed to show that he knew, at the time his codefendants entered the house, that the house was occupied. We must reject this argument. The evidence presented showed that Williams met with the codefendants and discussed breaking into a house where two elderly ladies lived. Williams knew that a handgun was to be used in the offense. The offense took place at 9 p.m. on a Tuesday evening, and Williams in his statement admitted that he had seen a light on in the house. One of the requirements of home invasion is that the defendant "knows or has reason to know" that there are persons in the house. (Ill. Rev. Stat. 1983, ch. 38, par. 12—11.) We believe that the evidence summarized above established that Williams had reason to know that the house was occupied at the time of the crime and that the State proved his accountability for the offenses committed.

██ Williams also makes a brief argument that it was legally inconsistent for the jury to find him guilty of home invasion, but not of aggravated battery. Unlike Smith and Miller, who were present at the time Bailey beat Isabelle Galuszynski, Williams never entered the house. It would not have been inconsistent for the jury to find that while Williams knew that his codefendants, while armed with a dangerous weapon, would threaten force against the occupants, there was no showing that he could anticipate the infliction of great bodily harm upon Isabelle Galuszynski.

██ Earl Miller and Fred Williams contend that they received ineffective assistance of counsel. Specifically, Miller maintains that his attorney was incompetent because he failed to consult with Miller before trial, was not present at certain court proceedings, including the hearing on Dexter Bailey's motion to suppress, failed to make a motion to suppress on behalf of Miller, presented no defense, waived closing argument and failed to file a written motion for a new trial. Williams contends that his attorney was incompetent because he failed to move to suppress the oral and written statements, failed to object to the admissibility of the statements during trial, failed to make a sufficient closing argument and adopted a trial strategy which essentially conceded Williams' guilt.

To establish ineffective assistance of counsel, a defendant must show that his attorney's presentation of the case was so constitutionally deficient that it produced substantial prejudice to the defendant, without which the result of the proceedings would probably have

been different. (*People v. Williams* (1986), 140 Ill. App. 3d 216, 228, 488 N.E.2d 649.) Competency is determined from the totality of counsel's conduct at trial and not upon isolated instances occurring during the course of the proceedings. (*People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1025-26, 486 N.E.2d 1297.) Errors in judgment, discretion, tactics or trial strategy do not establish incompetence. (*People v. McKendrick*, 138 Ill. App. 3d 1018, 486 N.E.2d 1297.) Counsel is not required to make futile motions or objections in order to provide effective assistance. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 492 N.E.2d 600.

 With respect to Miller, we stated earlier that he had no standing to challenge the legality of Bailey's motion to suppress. Therefore, the fact that his attorney was not present at the hearing on the motion could not have affected the outcome. Also, in the absence of a showing of some basis for a motion to suppress Miller's pretrial statement, we cannot conclude that counsel's failure to make the motion would have had an impact on the trial. Although no written post-trial motion was filed, the State made no objection to the oral post-trial motion. Under these circumstances, an oral motion is sufficient. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 1008, 395 N.E.2d 706.) Our review of the record reveals that Miller's attorney was well prepared, thoroughly cross-examined the State's witnesses and provided Miller with effective assistance of counsel.

 As with Miller, Fred Williams fails to state any basis which would have supported either a motion to suppress his pretrial statement or an objection to the statement's admission at trial. Williams' primary contention is that the trial strategy adopted by his attorney amounted to a concession of Williams' guilt. As stated earlier, Williams' attorney argued that the statement was so perfect in establishing all the necessary elements to convict, it could only have been fabricated by the assistant State's Attorney. It appears clear that this decision constituted unreviewable trial strategy and was within the sole discretion of defense counsel. (*People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 486 N.E.2d 1297.) After a review of the record, we are not persuaded by Williams' contention that he received ineffective assistance of counsel.

 Bailey and Smith next contend that their sentences for home invasions were improper because the trial court placed home invasion in a "super X category," thus ignoring the classification set by the legislature and indicating that a minimum sentence would never be imposed.

During the sentencing of the defendants, the trial court stated

that "the crime of home invasion is a crime that is in a super X category" and that rape and home invasion were not far behind the crime of murder. However, the record shows that immediately after making the "super X" statement, the trial court declared, "[t]he legislature has seen fit to provide the perimeters of the sentence for the offense of home invasion. *** There is a limit on the sentence, and there's a limit this Court will impose. This Court makes its remarks so it could indicate somewhere on the scale of the severity of the offenses that are involved." The sentences ultimately imposed on the crime of home invasion were well within the statutory guidelines for that offense. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(3).) In our view, the record affirmatively refutes the defendants' contention that the trial court ignored the classification of home invasion set by the legislature.

Next, Smith, Williams and Miller contend that their sentences were excessive in light of their potential for rehabilitation. James Smith was 19 years old with no prior convictions and had completed his education at the Kenwood Academy. Earl Miller was 22 years old and had only one other criminal conviction, which resulted in a sentence of one year's supervision for a misdemeanor theft in 1980. Fred Williams was not present in the home at the time the offenses occurred, and his participation in the crime was limited to that of a lookout. However, Williams had been placed on probation in 1983 for theft and violation of bail bond. None of these three defendants were involved in the beating of Isabelle Galuszynski.

It is well established that sentencing decisions are matters of judicial discretion and as long as the sentence imposed is within the statutory limits, a reviewing court will not exercise its power to reduce it absent a finding that the trial court abused its discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The presumption that the sentence imposed by the trial court was proper is overcome only by an affirmative showing that the sentence varies greatly from the purpose and spirit of the law or is manifestly violative of constitutional guidelines. (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 775, 445 N.E.2d 1213.) This court will not reduce the sentence imposed within statutory limits merely because we might have imposed a different punishment had that function been delegated to us. *People v. Duncan* (1981), 97 Ill. App. 3d 896, 899, 424 N.E.2d 67.

The trial court in the case at bar acknowledged the mitigating factors set forth by the defendants and concluded that they did have the potential for rehabilitation. However, given the serious

nature and circumstances of the offenses committed, the court believed that concurrent sentences of 15 years for home invasion, 10 years for residential burglary and 10 years for armed robbery were appropriate. Smith and Miller were also sentenced to five years for aggravated battery. These sentences are well within the statutory limits, and we find no basis upon which to conclude that the trial court abused its discretion in exercising its sentencing function. Although Williams' level of participation in the crime was less than that of Smith and Miller, the record shows that he had a prior criminal record. Also, despite Williams' assertion to the contrary, the record indicates that the trial court was well aware that he had not been convicted of aggravated battery.

 Finally, the defendants contend that their convictions on two counts of home invasion and one count of residential burglary violate the principle of "one act, one crime."[4]

The defendants are correct that each may be convicted of only one count of home invasion. (*People v. Ammons* (1983), 120 Ill. App. 3d 855, 458 N.E.2d 1031.) Therefore, this court will vacate one home invasion count as to each defendant. However, we have recently held that convictions for both home invasion and residential burglary may stand because residential burglary is not, by definition, a lesser included offense of home invasion and because the multiple convictions do not violate the one act, one crime principle. *People v. Govednik* (1986), 150 Ill. App. 3d 717, 724, 502 N.E.2d 276.

Accordingly, we vacate one of the home invasion convictions for each defendant; the remaining convictions and sentences are affirmed.

Affirmed in part; vacated in part.

LINN and McMORROW, JJ., concur.

---

[4]Although Dexter Bailey did not raise this issue, fundamental fairness requires that we consider the issue as to him also.