THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SOLOMON JOHNSON *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—85—1979, 1—85—2199 cons.

Opinion filed June 26, 1989.—Modified on denial of rehearing September 25, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (Gregory W. O'Reilly, Assistant Public Defender, of counsel), for appellant Irvin Johnson.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant Solomon Johnson.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Paula Carstensen, and Nancy Nolan Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a joint jury trial, defendant Irvin Johnson was convicted of murder and armed robbery and sentenced to concurrent prison terms of 80 years and 14 years, respectively; defendant Solomon Johnson, not related to Irvin, was convicted of murder and sentenced to a prison term of 80 years, which was subsequently reduced to 35 years.

On appeal, Irvin and Solomon contend that the trial court erred in denying their individual motions for severance on the grounds that: (a) their defenses were antagonistic and (b) a joint trial denied them their constitutional right to confront their accusers. Solomon contends individually that: (1) the State failed to prove that Solomon or those for whom he was accountable caused or contributed to the victim's death; (2) the trial court's refusal to instruct the jury on lesser included offenses denied Solomon his constitutional rights to due process and trial by jury; (3) the State's comments during closing argument regarding the cause of death and Solomon's burden of proof denied Solomon a fair trial; and (4) defense counsel's failure to present expert testimony that Solomon's acts did not cause or contribute to the victim's death denied Solomon his right to effective assistance of counsel. Irvin contends individually that: (1) the trial court erred in denying his motion to suppress his statement; (2) the trial court erred in prohibiting defense counsel from asking a police officer during cross-examination whether he would have allowed Irvin to leave the police station when Irvin was brought to the station for questioning; (3) the trial court erred in admitting into evidence clothing purportedly taken from Irvin after his arrest; (4) the State's comments during closing argument regarding Irvin's failure to call certain witnesses denied Irvin a fair trial; and (5) the substitution of judge provision of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—5) is unconstitutional because it denies defendants who are charged with Class X felonies and tried jointly the same number of automatic judge substitutions granted to defendants who are charged with Class X felonies and tried singly. For the following reasons, we affirm in part, reverse in part, and remand for new severed trials.

The record sets forth the following facts. Approximately noon on February 20, 1981, the body of a male was found lying facedown in a drainage ditch along 155th Street in Harvey, Illinois. His face and body had been severely beaten and he was wearing only jockey shorts and had a cloth belt and wire hanger wrapped around his neck. A short distance away, an investigator found a hammer in the weeds.

Through fingerprint identification, the investigators identified the victim as Steven Freeman. They then interviewed Freeman's roommate, who told them that he had last seen Freeman alive on Thursday night, February 19, at a bar on 157th Street and Halsted. Freeman had been wearing blue jeans, a flannel shirt and a brown vest and had been driving a 1974 red Ford pickup truck with license plate number 813562B. The detectives notified the State Police of the information regarding the truck.

On Saturday, February 21, approximately 7:50 p.m., Paul Teegarden, an Illinois State trooper, spotted Freeman's truck parked along I-74, just outside of Danville. Two men were walking nearby along the highway. When the two men, Kenny McCray and Wilbur Johnson (Solomon's brother), admitted that they had been driving the truck, the officers took them into custody. Later that night, Chicago Detectives Fike and McCarthy drove to Danville to arrest McCray and Wilbur Johnson. At that time, McCarthy recovered a brown vest spotted with blood from Wilbur. The vest matched the description of the one Freeman had been wearing on the night he was murdered. The detectives and an evidence technician also examined the truck and discovered dried blood on the truck's bed.

During the early morning hours of February 22, Detectives Fike and McCarthy took Wilbur and McCray to the Harvey police station, where they tape-recorded their interviews. Wilbur told Fike that McCray had told him that Irvin Johnson, Larry McElroy and Wolf Payne had been involved in Freeman's murder. McCray later denied having told this to Wilbur. After the interviews, Wilbur and McCray remained in custody while the detectives located Irvin Johnson and Larry McElroy.

Approximately 10 a.m. on February 22, Detectives Fike and McCarthy went to Irvin's house with Markham plainclothes officer Henry Wilson. Wilson had known the Johnson family for approximately 16 years. Wilson and a uniformed officer went to the door of Irvin's house. When Mrs. Johnson answered the door, Wilson told her that they wanted to talk to Irvin. A few minutes later, Irvin appeared in his bathrobe. Irvin agreed to accompany the officers to the police station and Irvin was never handcuffed.

When Irvin arrived at the Harvey police station, he was put in an interview room by himself. The State claims that Irvin was in the room for 45 minutes, and the defense claims he was in there for 1½ hours. The defense also claims that the door to the room was locked. Approximately noon, Detectives Fike and McCarthy brought Irvin to their office for questioning. Prior to questioning, Irvin was read his

*Miranda* warning. Fike then questioned Irvin for approximately one hour, after which he was arrested. A State's Attorney was called approximately two hours later, and at 5:20 p.m., Irvin made a court-reported statement, which was subsequently published to the jury. In the statement, Irvin told the officers that in the early morning hours of February 20, 1981, he was at the Southern Lounge with Larry McElroy. Outside the lounge, they joined Wolf Payne, an acquaintance, and Steven Freeman, whom Irvin had never met. All four of the men drove to another lounge in Payne's car. After having a drink, they all drove to Freeman's truck, which was parked near the Southern Lounge. McElroy got in the truck with Freeman. Payne and Irvin followed in Payne's car. They drove to an old baseball field and stopped. Irvin saw Freeman get out of the truck first. Then McElroy got out and started choking Freeman. Payne then put on some gloves and started hitting Freeman in the face and stomach.

When Irvin realized he was just as guilty as those that were hitting Freeman, he got out of the car and started hitting and kicking him, too. Irvin stated that Freeman was "pretty badly beaten" and they took everything out of his pockets, removed his clothes and threw them in the weeds. Payne then walked back to his car and left. McElroy and Irvin put Freeman into the back of the truck and Irvin also climbed into the back.

While McElroy was driving the truck, Freeman kept rising up. Because they wanted Freeman to stay down, McElroy drove to his house and picked up a cotton string or belt and told Irvin to wrap it around Freeman's throat. Irvin put the cotton belt around Freeman's throat, and then McElroy put on a glove, and they both tried to strangle Freeman. Irvin claims that they were not able to kill him.

McElroy and Irvin then drove to Solomon's house and picked him up, after which the three of them drove to Irvin's mother's house to pick up a hammer. They then drove back to the baseball field, and McElroy and Solomon got out of the truck with the hammer. Irvin did not see what they were doing, but when they got back into the truck, there was blood on the hammer. The three of them took Freeman's body off the truck and threw the hammer in the weeds. Irvin believed that Freeman was dead at this point.

On March 2, 1981, Solomon Johnson was arrested on a warrant for Freeman's murder. After his arrest, Solomon gave a court-reported statement which was subsequently published to the jury. According to Solomon, on February 20, 1981, approximately 4:30 a.m., Irvin came to the front of his house and banged on the door. Both Solomon and his mother told Irvin to go away. A few minutes later,

Larry McElroy knocked on the back door and told Solomon that he needed Solomon's help. When Solomon refused to go out, McElroy kept pleading with him until finally Solomon went outside to see what McElroy wanted. McElroy was parked outside of Solomon's house in a red pickup truck. Irvin was with him. Solomon got into the truck, and McElroy drove away.

When Solomon asked McElroy what had happened, he said that Irvin had "punked out on him." They then stopped at Irvin's house, so that Irvin could pick up a hammer. While Irvin was inside, McElroy again told Solomon that he needed his help. He said he had brought Irvin "into it," but didn't trust Irvin and thought Irvin "might mess up." McElroy mentioned the word "holdup," but then Irvin got back into the truck and the three men drove away. While they were driving, McElroy told Solomon to look in the back. When he turned around, he saw "a blood spot on the window with a string of hair, *** a blanket covering him up [and] *** his leg sticking out." When Solomon asked McElroy what was happening, he said that they were going to make sure the "dude" was dead and he needed Solomon's help because he knew Solomon would not tell.

McElroy then stopped the truck and all three of the men got out. When McElroy pulled the blanket off the body and Solomon saw that the body was naked except for underwear and that the victim's face was all smashed in, Solomon said, "[T]his man is dead already." McElroy replied that he wanted to make sure and handed the hammer to Irvin, who hit the victim's face a couple of times. Irvin then gave the hammer to Solomon and he hit the victim's head twice. McElroy then grabbed the hammer from Solomon and started hitting the body 9 to 12 times. Irvin and Solomon then pulled the body off of the truck, and Irvin and McElroy tossed it into a nearby ditch. All of the hammer hitting was done on the truck. No one hit the body when it was on the ground. After they disposed of the body, the three men drove to the baseball field to pick up the victim's clothing.

Prior to trial, the trial court denied Irvin's motion to suppress his statement, finding that Irvin had voluntarily accompanied the police to the station and had voluntarily given a statement. The trial court also denied Irvin's and Solomon's motions for severance, finding that the defenses of Irvin and Solomon were not antagonistic and that there was no violation of the confrontation clause. Neither defendant testified at trial. Additional facts will be discussed as they are relevant to our discussion of the issues.

On appeal, both Solomon and Irvin contend that the trial court erred in denying their individual motions for severance of their joint

jury trial. In his pretrial motion, Irvin moved to sever his trial from that of his codefendant, Solomon, on the ground that his defense was patently antagonistic to Solomon's defense. Solomon claimed that he was not present or any way involved in Freeman's murder and that Irvin and Larry McElroy murdered Freeman by strangulation prior to picking up Solomon. The trial court denied the motion.

Similarly, prior to trial, Solomon moved for severance on the grounds that: (1) Irvin's inculpatory statements deprived him of his sixth amendment right to confrontation; and (2) the defenses were antagonistic. Initially, the trial court granted Solomon's motion on the confrontation clause grounds, finding that Irvin's and Solomon's statements were not interlocking. However, after reviewing *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, the trial court reversed its ruling and denied the motion for severance on the grounds that both Irvin and Solomon had made statements incriminating themselves.

The general rule in Illinois as to severance is that when defendants are jointly indicted, they are to be jointly tried unless fairness to one of them requires a separate trial to avoid prejudice. (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) The decision to order separate trials is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. (*People v. Duncan* (1987), 115 Ill. 2d 429, 505 N.E.2d 307.) Failure to sever is ground for reversal unless it can be said that the trial court's failure to do so was harmless beyond a reasonable doubt. *People v. Smith* (1988), 172 Ill. App. 3d 94, 526 N.E.2d 849.

Traditionally, Illinois courts have recognized two primary forms of prejudice which give rise to severance. First, where the codefendants' defenses are so inconsistent or antagonistic that one of the defendants could not receive a fair trial if tried jointly with the other, severance is necessary. (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) Actual hostility between the two defenses is required. (*People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349.) Second, if, in a joint trial, the State introduces the extrajudicial admissions of a nontestifying codefendant which implicate the defendant, the defendant may be denied his constitutional right of confrontation because the defendant cannot call the codefendant to the stand for cross-examination. (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The *Bruton* problem may be resolved by granting a severance or by redacting the codefendant's statements which are published to the jury to omit any reference to the defendant. (*Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d

176, 107 S. Ct. 1702.) In *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, the supreme court carved out an exception to the *Bruton* rule, stating that the extrajudicial statements of codefendants were admissible with proper limiting instructions provided that the defendant has also confessed and his confession interlocked with and supported his codefendant's confession. Subsequently, in *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, the Supreme Court rejected *Parker v. Randolph* and held that where the defendant denies his own statement which interlocks with his codefendant's statements, the codefendant's interlocking confession is constitutionally inadmissible. Accordingly, unless there is independent indicia of the reliability of the statements (*Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056), severance is required "whenever a codefendant's statement interlocks with the defendant's statement, which he denies the truth of at trial, because the admission of the codefendant's corroborating statement is so devastating to the defendant's defense as to deny him a fair trial." *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 705, 510 N.E.2d 1026.

As stated, in the present case, Irvin argued that severance was required because his defense and that of Solomon were antagonistic. Solomon argues that both forms of prejudice, *i.e*, antagonistic defense and confrontation clause violation, occurred as a result of being tried jointly with Irvin. The issue of whether the defenses were antagonistic will be addressed first.

The Illinois Supreme Court addressed the question of antagonistic defenses in *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349. In *Bean*, Harold Bean was jointly tried with Robert Byron for several crimes relating to the death of Dorothy Polulach on February 17, 1981. Both were sentenced to death. The facts indicate that Bean, Byron and Robert Egan agreed to burglarize Dorothy Polulach's home for payment from her step-son-in-law, Wayne Walters. Bean also had suggested killing Dorothy. On February 17, 1981, Egan drove Bean and Byron to within a few blocks of Dorothy's house. At one point, Byron returned to the car for a gun. Bean later described to Egan how he had handcuffed and shot Dorothy. When Dorothy's body was discovered, the police questioned her step-son-in-law, who implicated Byron, Bean and Egan. When Byron was arrested, he denied participation. Bean fled, but was later arrested after his girl friend gave police a statement that Bean had confessed to the killing and was hiding in a nearby forest preserve.

Before trial, Byron's and Bean's attorneys moved for severance

based on antagonistic defenses. Byron's attorney stated that Byron's defense was an alibi for that night and that Byron would testify that Bean was the murderer. The trial court denied severance. Thereafter, in his opening statement, Byron's counsel repeatedly referred to Bean. Bean's motion for a mistrial was denied. Further, during the course of trial, Byron's attorney reiterated the theory that Bean was the murderer and continued to do so during closing argument. Bean was convicted, sentenced to death, and appealed directly to the supreme court.

The supreme court held that Byron's defense strategy was hopelessly antagonistic to Bean's constitutional rights and that the two defendants should have been tried separately. In reaching its decision, the court stated that "Byron's defense was that Bean was the murderer. He could only convince the jury of his own innocence by convincing them to convict Bean. Obviously, this strategy resulted in irreparable prejudice to Bean and could only have been avoided by the mechanism of a separate trial." (109 Ill. 2d at 95.) Further, the court held that any set of circumstances that deprives a defendant of a fair trial is sufficient to require severance and the prejudice to each defendant need not be symmetrical.

Similarly, in the present case, Solomon's defense was that Irvin was the murderer. He could only convince the jury that he was not guilty of murdering Freeman by convincing them that Freeman had already been murdered by Irvin and McElroy prior to the time they picked up Solomon. In direct contradiction to Solomon's defense theory, Irvin claimed that Freeman was not dead until after McElroy and Solomon had pummeled him with a hammer. Irvin claimed he had no idea this was happening at the time and that he had not participated in the pummeling. Solomon, however, indicated in his statement that all three of them had hit Freeman with the hammer.

■ In addition, in the present case, Solomon's opening statement at trial implicated Irvin and there is no indication that the trial court ever ordered that Irvin's name be stricken from Solomon's statement to the police, which was admitted into evidence. Solomon's sole witness, his mother, also implicated Irvin. Accordingly, we conclude that because the circumstances deprived both defendants of a fair trial, severance should have been granted on the ground that the defenses were antagonistic.

Although our decision that the defenses were antagonistic obviates the need to discuss Solomon's contention that the joint trial deprived him of his constitutional right to confrontation, we elect to do so to demonstrate that further grounds exist for severance. In our

view, *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026, is dispositive of the issue. In *Lincoln,* the trial judge relied upon *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, to deny severance on the grounds that the codefendants' statements were properly admissible because they interlocked. The appellate court reversed the trial court's decision on the ground that the *Parker* decision was overruled by *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, during the pendency of the appeal. The *Lincoln* court stated, "Here, since the trial court's denial of severance was based on the grounds rejected by the United States Supreme Court during the pendency of this appeal, defendant Lincoln's conviction must be reversed and the case remanded for a new trial. [Citation.] Also, as required by *Lee* [*v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056], the State will have to provide an independent basis for the admission of codefendants' statements in any new trial." 157 Ill. App. 3d at 706.

Similarly, in the present case, the trial court's denial of Solomon's motion for severance was predicated on *Parker v. Randolph,* which was overruled during the pendency of this appeal. Further, we find the exception to the admission of interlocking confessions enunciated in *Cruz* relevant in the present case. The *Cruz* court noted that when a codefendant's statement interlocks with the second codefendant's statement, and the second codefendant later claims that his statement is untrue or was coerced or is otherwise unreliable, the second codefendant is prejudiced by the fact that the statements interlock. Accordingly, severance should be granted. This situation is present in the case at bar. At trial, Irvin's counsel challenged the credibility of Irvin's statement by claiming that it was "just a mirror of things told Irvin," while he was under intense police pressure and did not accurately reflect what had happened.

In addition, the recent Illinois Supreme Court opinion, *People v. Mahaffey* (1989), 128 Ill. 2d 388, further supports our conclusion that the trial court's denial of defendants' motions to sever violated defendants' constitutional rights under the confrontation clause. In *Mahaffey,* defendants Jerry and Reginald were convicted of the murders of Dean and Jo Ellen Pueschel and the attempted murder of their son and sentenced to death. Defendants appealed directly to the supreme court.

Among numerous other issues raised on appeal, Reginald contended that the trial court erred in failing to grant his motion for a severance on the grounds that the admission of Jerry's confession implicating him in the crimes denied him his right to confront witnesses.

Jerry did not join the motion because Reginald had testified at trial and had been subject to cross-examination concerning his statement implicating Jerry.

In holding that the trial court had erred in denying severance, the supreme court found that the statements did not satisfy the *Lee v. Illinois* criterion of interlocking statements because the statements diverged on the core question of who was responsible for the attacks on the victims. Reginald claimed Jerry stabbed the boy; Jerry claimed Reginald did it. Reginald never mentioned stabbing the man; Jerry claimed Reginald stabbed the man four to five times. Reginald stated that Jerry had hit the woman on the head with a baseball bat as she lay on the floor. Jerry claimed Reginald delivered the final blows with a hammer.

The *Mahaffey* court found that these discrepancies are the very kind of "buck-passing posturing" which constitute a "truly unreliable confession," and as such, under *Lee*, would not be admissible as substantive evidence against a nontestifying codefendant. Further, the *Mahaffey* court held that under *Cruz v. New York*, even if the jury were instructed not to consider Jerry's statement against Reginald or that Reginald's own statement was admitted against him, this would not cure the defect. Furthermore, because Jerry had not testified, the error was not harmless. Accordingly, the court reversed Reginald's convictions and remanded the cause for a new trial.

Similarly, in the present case, we find that both Irvin's and Solomon's statements constitute "buck-passing posturing." Irvin claimed Freeman was not dead when Solomon and McElroy began hitting him with the hammer, and Irvin denied participating in or even being aware that the other two were hitting Freeman with a hammer. In direct contradiction, Solomon claimed that Freeman was already dead when Irvin and McElroy picked Solomon up at his house and that Solomon had participated in inflicting the hammer blows.

Moreover, we find *People v. Nunn* (1989), 184 Ill. App. 3d 253, *People v. Smith* (1988), 172 Ill. App. 3d 94, 526 N.E.2d 849, and *People v. Parks* (1988), 168 Ill. App. 3d 978, 523 N.E.2d 130, relied upon by the State as supplemental authority, to be factually distinguishable and unpersuasive. In *Nunn*, seven codefendants were tried jointly and found guilty of murder. Three of them were also found guilty of armed robbery. In a simultaneous bench trial, the eighth codefendant was found guilty of murder and armed robbery. All of the defendants gave statements which were introduced into evidence at trial and none of the defendants testified. On appeal, the *Nunn* court declined to address defendants' argument that they should have been granted

separate trials, stating that because all of the defendants were convicted on the theory of accountability, any alleged error regarding severance would be harmless beyond a reasonable doubt. The *Nunn* court further noted that one of the defendants admitted that he had precipitated the attack and had participated in the assault with the seven others. In conjunction with this admission, the statements of the seven others showed that each was accountable for the actions of the others and each possessed intent to cause the victim great bodily harm. Unlike *Nunn*, in the present case, neither Irvin nor Solomon was found guilty of murder pursuant to the accountability theory. Instead, Irvin and Solomon each attempted to inculpate the other while exculpating himself. It is well recognized that when one defendant accuses another of a crime under circumstances in which the declarant stands to gain by inculpating the other, the accusation is inherently suspect and must be subjected to cross-examination. *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.

We also find *People v. Smith* (1988), 172 Ill. App. 3d 94, 526 N.E.2d 849, distinguishable. In *Smith*, three defendants were tried jointly before a jury and convicted of several offenses arising from a home invasion and armed robbery. A fourth defendant was tried simultaneously by the court. Prior to trial, each defendant had made statements implicating himself and certain codefendants. Defendants' individual motions for severance were denied on the ground that because the statements were interlocking, they were admissible, providing that the court informed the jury that each statement would be considered only against its maker. On appeal, the *Smith* court held that the trial court's failure to sever the trials was harmless beyond a reasonable doubt because the victim positively identified the defendants and the defendants' statements coincided with the victim's testimony regarding the particulars of the crime. The present case is distinguishable from *Smith* on the pivotal facts that the victim was dead and there was no other eyewitness testimony to corroborate Irvin's and Solomon's statements.

Similarly, in *People v. Parks* (1988), 168 Ill. App. 3d 978, 523 N.E.2d 130, Parks and Johnson were represented by separate counsel at a joint jury trial and convicted of burglary. Prior to trial, both defendants had made statements admitting that they had entered the apartment building in which they were arrested to steal sinks. At trial, Parks denied having made that statement to the police. Johnson did not testify. Both post-arrest interlocking statements were admitted into evidence. On appeal, Parks argued that his sixth amendment right to confrontation was violated when Johnson's statement was ad-

mitted into evidence. The *Parks* court held that Johnson's statement was directly admissible against Parks because the corroborating testimony by the police officers regarding physical evidence at the scene of the offense constituted independent indicia of the statements' reliability. In the present case, there is no such independent indicia of the statements' reliability.

For the aforementioned reasons, we conclude that Irvin's and Solomon's defenses were antagonistic and that the trial court's admission of their statements denied them their sixth amendment right to confrontation. Accordingly, we reverse the trial court's judgment and remand the cause for new severed trials.

In light of the fact that the issue as to whether the trial court erred in denying Irvin's pretrial motion to suppress his statement may arise upon remand, we next address that issue. However, our decision to remand the cause for new severed trials obviates the need to address the remaining issues.

Regarding Irvin's motion to suppress his statement, Irvin contends that he was unlawfully seized when, without probable cause, the police took him from his home to the police station in a squad car, locked him in an interview room for 1½ hours and then interrogated him for over one hour, after which he was arrested. Irvin claims that his statement was the product of the illegal seizure.

In response, the State argues that Irvin voluntarily agreed to accompany the police to the station to answer questions and was not placed under arrest. In the alternative, the State also argues that, based upon Wilbur Johnson's identification of Irvin as one of the perpetrators of the crime, the police had probable cause to arrest Irvin.

■ In determining whether an arrest has been made, courts focus on the intent of the police officers and the understanding of the individual being questioned at the time that individual is detained. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) In assessing the officers' intent, the court will consider whether there was any formal declaration of arrest and whether other routine procedures associated with arrest were present, such as searching, booking, handcuffing, fingerprinting and photographing. (*People v. Gale* (1979), 72 Ill. App. 3d 23, 390 N.E.2d 921.) In assessing the understanding of the individual being questioned, the court is not concerned with what that particular individual thought. Rather, the court is concerned with what a reasonable person, innocent of any crime, would have thought in similar circumstances. The assumption that an individual is required to cooperate with the police cannot be equated with an arrest since every citizen has a duty to assist police officers up to the point

of self-incrimination. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

In the present case, at approximately 10 a.m. on Sunday morning, Detectives Fike and McCarthy waited in the police car while plain-clothes officer Wilson and uniformed officer Talonga went to Irvin's kitchen door. Officer Wilson had known Irvin's family for 16 years and had even dated Irvin's sister at one time. When Irvin's mother answered the door, Officer Wilson told her that they wanted to speak with Irvin. The officers waited in the kitchen for several minutes until Irvin appeared in his bathrobe. The officers did not question Irvin at home. Instead, they asked him to accompany them to the police station for questioning. Irvin agreed. Although Officer Wilson did not let Irvin out of his sight while he was getting dressed, the officers never displayed any weapons, the squad car did not have a grill between the front and back seats, and Irvin was not handcuffed.

■■ At the police station, Irvin was taken to an interview room. Irvin stated that the room was locked. Approximately 45 minutes to 1½ hours later, Detectives Fike and McCarthy took Irvin to Fike's office and read him his *Miranda* warnings. Fike then questioned Irvin for over an hour. Irvin was never searched, handcuffed, photographed or placed in a lineup. Fike testified that Irvin incriminated himself during this questioning and, as a result, Irvin was arrested at approximately 1 p.m. Irvin did not give his court-reported statement until approximately 5:20 p.m. There is no evidence that Irvin complained about his treatment by the police. In light of the evidence as to circumstances leading up to Irvin's statement, we do not find that the denial of Irvin's motion to suppress was manifestly erroneous. Further, those cases relied upon by Irvin are distinguishable from the facts at bar and unpersuasive: *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (defendant was taken involuntarily to the police station); *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103 (defendant was interrogated for more than 12 hours, submitted to search of his automobile and to request for samples of his head and pubic hair and fingernail scrapings; placed in lineup); *People v. McBride* (1987), 157 Ill. App. 3d 955, 510 N.E.2d 1087 (defendant was handcuffed at his workplace, taken to the police station, chained to a wall and questioned); *People v. Langlo* (1987), 153 Ill. App. 3d 636, 505 N.E.2d 1338 (defendant was subjected to lengthy continuous questioning at the police station).

■■■ Even if we found that Irvin had not voluntarily accompanied the police to the station, we find that the trial court properly denied Irvin's motion to suppress his statement on the ground that

probable cause existed for Irvin's arrest at his home. The question of whether probable cause exists is a commonsense, practical question to be determined by the totality of circumstances. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Generally, probable cause to arrest exists where the circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe an offense has been committed and that the person arrested committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147; *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228.) In determining whether the officer had probable cause, the officer's factual knowledge based on his prior law-enforcement experience is sufficient. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Further, probable cause may be founded upon evidence which would not be admissible at trial and which need not be sufficient to establish guilt beyond a reasonable doubt. (*People v. Green* (1980), 88 Ill. App. 3d 929, 410 N.E.2d 1003.) In fact, even hearsay is proper grounds for establishing probable cause. Thus, an officer can relate data that was observed by another and told to him. Provided that the person supplying the data is a citizen-informer and not a police informer, the police do not have to establish the informer's prior reliability or to corroborate the information. (*People v. Beto* (1980), 86 Ill. App. 3d 622, 408 N.E.2d 293.) Moreover, even information from a suspect which implicates another provides sufficient grounds for probable cause if buttressed by corroborating evidence or by the officer's knowledge and experience. *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 988; *People v. Denham* (1968), 41 Ill. 2d 1, 241 N.E.2d 415.

In *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998, a woman's body was discovered by the maintenance man at her apartment building. Police observed that entry to the apartment had been by a broken kitchen window. The woman had been strangled, was nude from the waist down, and her hands and legs were tied.

The maintenance man told the police that the woman had moved into the apartment the previous week and had been assisted by three men in a red Ford truck. The maintenance man knew one of the men as "Gigolo" and stated that Gigolo had been at the victim's apartment several days earlier.

Upon investigation, the police determined that Gigolo was Edward Meeks and brought Meeks in for questioning. At first, Meeks denied involvement, then confessed and implicated James, stating that James had strangled the victim. Meeks also gave details of robbery to the police.

Based on Meeks' statements, the police brought James into custody. Initially, James denied knowledge of the crime. Then, when he was told that Meeks had implicated him, he admitted involvement and signed a written confession.

The trial court ruled that Meeks' arrest was without probable cause and suppressed his confession. The supreme court reversed, stating that Meeks' statements were sufficient to establish probable cause to arrest James. In reaching its decision, the court noted the requisite indicia of reliability of Meeks' statement was established by the facts that the information Meeks provided was corroborated by the officer's observations at the scene; Meeks specifically identified his accomplice; Meeks had not been offered any specific inducement for identifying his accomplice; and the police investigation provided independent verification of a substantial part of the statement. Based upon these facts, the *James* court concluded that "[t]o decide [that probable cause did not exist] would ignore the [United States] Supreme Court's admonition that the probable cause determination is a 'commonsense, practical question.' " 118 Ill. 2d at 225, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328.

In the present case, at approximately noon, February 20, 1981, the victim's body, clad only in jockey shorts, was found lying facedown in a drainage ditch. Upon learning the victim's identity, police questioned his roommate and learned that the victim had been last seen in a bar in Harvey, Illinois, wearing blue jeans, cowboy boots and a brown vest. The victim had been driving a red 1974 Ford pickup truck with license plate number 813562B. The police then put out a bulletin describing the truck, requesting that it be impounded and any occupants detained. The evening after the victim's body had been discovered, an Illinois State trooper spotted the truck in a ditch on I-74, just west of Danville. About the same time, Kenneth McCray and Wilbur Johnson (Solomon's brother) approached another trooper, admitted that they had been driving the truck, and stated that they were on their way into Danville to get repair help for the truck. The State troopers held McCray and Wilbur for the Harvey police. Wilbur was wearing a vest which matched the description of the one the victim had been wearing and the vest was stained with type B blood, the victim's type. In addition, human blood type B fibers were recovered from the truck's tailgate, from the rear quarter panel of the truck, from the inside passenger doorjamb, and from a T-shirt found inside a tool box in the truck.

Wilbur and McCray were then transported back to Harvey and in-

terviewed. Wilbur told the police that Irvin, Wolf Payne and Larry McElroy had killed the victim. Based on this information, plus the Harvey officers' familiarity with Irvin's police record and his mental problems, the police arrested Irvin.

Pursuant to the totality of circumstances test enunciated in *Illinois v. Gates*, and followed in *People v. James*, we conclude that the police had probable cause to arrest Irvin. At the time that Wilbur was arrested, wearing the victim's bloodstained vest and driving the victim's bloodstained truck, the police could properly have concluded that Wilbur had direct knowledge of the crime. The bloodstained condition of the truck corroborated evidence already discovered by the police. Further, there is no evidence that Wilbur had been offered any inducement to implicate McElroy, Payne and Irvin. We find that these facts, together with the officers' prior knowledge of Irvin's police record, were sufficient to establish a reasonable belief that Irvin had committed the offense.

Finally, pursuant to the requirement of *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366, that an appellate court must make a determination as to the sufficiency of the evidence when it reverses a conviction and remands the cause for a new trial, we conclude that the evidence at trial was sufficient to establish defendants' guilt beyond a reasonable doubt. Although this finding is not binding on retrial, it is necessary so as to remove the risk of subjecting defendants to double jeopardy. *People v. Jackson* (1986), 150 Ill. App. 3d 1, 501 N.E.2d 133.

For the following reasons, we affirm the trial court's judgment denying Irvin's motion to suppress his statement; reverse the trial court's denial of defendants' motions for a severed trial; and remand the cause for new severed trials.

Affirmed in part; reversed in part; and remanded for new, severed trials.

MANNING, P.J., and O'CONNOR, J., concur.