2022 IL App (1st) 160800-U
No. 1-16-0800
August 1, 2022

FIRST DIVISION

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, )<br>)<br>Plaintiff-Appellee, )<br>)<br>v. )<br>)<br>TIMOTHY BARBER, )<br>)<br>Defendant-Appellant. ) | Appeal from the Circuit Court<br>Of Cook County.<br><br>No. 14 CR 2275 (01)<br>    14 CR 2275 (02)<br><br>The Honorable<br>Charles P. Burns,<br>Judge Presiding. |

JUSTICE WALKER delivered the judgment of the court.
Justice Mikva specially concurring. Justice Oden Johnson[1] concurring and dissenting in part.

ORDER

Held: When a defendant presents evidence that he used deadly force in response to an attempted robbery, the prosecution must prove beyond a reasonable doubt that the defendant lacked justification for his acts. A defendant convicted as an accomplice may assert the principal's justification as a defense.

---

[1] Oral argument was held in this case before a panel that included Justice Walker, Justice Griffin, and Justice Pierce. Justice Griffin has retired, and Justice Oden Johnson has been assigned in his place. Justice Oden Johnson has read the briefs and listened to the oral argument. Justice Pierce recused himself and Justice Mikva was assigned in his place. Justice Mikva has also read the briefs and listened to the oral argument.

¶ 1    Following a bench trial, Timothy Barber (Timothy) was found guilty of second degree murder and sentenced to a term of 27 years' imprisonment. Timothy appeals arguing that (1) the evidence did not prove him guilty of second degree murder beyond a reasonable doubt; (2) the trial court improperly excluded evidence of Lamont Larkins's prior violent conduct; (3) the trial court imposed an excessive sentence; and (4) the court erred in its calculation of court fines, fees, and costs.

¶ 2    We find that the State failed to refute Timothy's evidence that he acted to prevent a robbery, a forcible felony. Because the evidence does not show beyond a reasonable doubt that Timothy lacked justification for his use of force, we reverse the conviction.

¶ 3                                    I. BACKGROUND

¶ 4    On August 29, 2013, Gregory Benson and Lamont Larkins went to the home of Dorothy Brown (Brown), where they played cards against Brown's nephew, Timothy, and Timothy's son, Jason Smith (Jason), at a table set up outside the house. Several others came into the yard to socialize, including Brown's daughter, Tara Barber; Tara's boyfriend, Taurean Holmes; Tara's friend, Katrina Baker; and Baker's boyfriend, Arthur Terry.

¶ 5    Larkins and Jason bet on the card game. Larkins accused Jason of cheating, then took cash from Jason's hand and punched Jason in the face. After a second punch, Jason tried to fight back. Larkins, who outweighed Jason by 50 pounds, soon overpowered Jason. Timothy joined in the fight, which ended when Larkins yelled that someone stabbed him. Larkins fell in the alley, Benson called 911, and Timothy ran off.  Larkins died from a stab wound that penetrated his heart.

¶ 6    Prosecutors charged Timothy and Jason with first degree murder, and they both argued at their joint bench trial that they acted in self-defense. The trial court granted the State's motion *in*

2

*limine* to bar evidence of the victim's prior arrests for domestic battery, criminal damage to property, and unlawful restraint, but ruled that the victim's conviction for robbery was admissible pursuant to *People v. Lynch*, 102 Ill.2d 194 (1984).

¶ 7    During the trial, Benson testified that Timothy flicked a box cutter repeatedly during the card game. Benson estimated the length of the box cutter at 1½ inches when closed and perhaps 3 inches when opened. When Larkins first accused Jason of cheating, Jason allowed Larkins to take the pot. The game remained friendly through the second accusation of cheating.   When Jason needed change for a $10 bill, he went into the house and returned a few minutes later without change. Larkins took the $10 bill from Jason's hand and said, "this my money, do something bout it now." Larkins then punched Jason, who fell back. When Larkins continued hitting Jason, even after Larkins appeared to have gotten the best of the fight, Timothy jumped in, slashing Larkins with the box cutter. Benson saw no other weapon.

¶ 8    Terry testified that he saw a friendly card game, then he heard Larkins and Jason arguing about money. Larkins grabbed cash from Jason's hand, knocked over the table, and hit Jason in the face. Jason told Larkins to leave, but Larkins refused. Jason went inside, and when Jason returned a few minutes later the fight resumed. Terry did not see any weapons.

¶ 9    On cross-examination, defense counsel sought to clarify Terry's testimony about when Larkins took cash from Jason's hand. Terry answered, "It was before he even went into the house." However, Terry agreed that he told police that "after Jason came back out of the house, [Larkins] grabbed the money from him."  On another attempt, counsel asked, "[W]hen Jason went into the house, he came out with a $10 bill, right?" Terry answered, "I wouldn't say yes or no.  I am unsure for that one."

¶ 10    Baker testified that she saw a friendly card game and then heard some argument about money.  Larkins said, "you are not getting this money." Jason and Larkins argued more, then Jason went into the house. Baker went inside and saw Jason coming out.  She did not see the fight start.

¶ 11    Tara testified that she was tending to her children inside the house when she heard Larkins say, "squad up," meaning put up your fists and fight. Tara woke up Brown and asked her to try to break up the fight while Tara stayed inside with her children.

¶ 12    Brown testified that she went to sleep early, and Tara woke her. By the time she arrived outside, Larkins was on the ground wounded with Jason holding a cloth on the wound. Larkins said, "I'm dying." Jason told him to lie still. According to Brown, Jason became frustrated because Larkins would not lie still. Jason went into the house, leaving Brown to tend to Larkins while they waited for the ambulance and police. When police arrived, Brown returned to the house and asked Jason what happened. Jason said that Larkins accused him of cheating, took his money, and during the fight, Jason stuck Larkins twice.

¶ 13    The prosecution presented a video recording of Timothy answering questions at the police station. He admitted that he intervened in the fight when he saw his son losing, and he slashed at Larkins with a box cutter.

¶ 14    Dr. Eric Eason, the medical examiner, found several superficial cuts on Larkins that were not life-threatening. A box cutter could have made the cuts but would not have killed Larkins. The fatal wound was a cut six inches deep that reached his heart. In the medical examiner's opinion, a blade at least four inches long made the fatal wound.  No box cutter could have made that wound.

¶ 15    Both defendants argued that they acted to defend Jason from a robbery. The judge stated:

"It is a card game.  It is a dispute over winnings.  *** While it may be antisocial and it may be wrong, at best, at best, it is a theft by person.  It is nowhere near a robbery.

There was no force used to take that. *** It is not something where a person is being knocked down on the street and your purse is being taken ***.

*** There is no forcible felony."

¶ 16    The court found Timothy guilty of second degree murder and sentenced him to 27 years in prison.  Timothy now appeals.

¶ 17                                              II. ANALYSIS

¶ 18    On appeal, Timothy argues that (1) the evidence did not prove him guilty of second degree murder beyond a reasonable doubt; (2) the trial court improperly excluded evidence of Larkins's prior violent conduct; (3) the court imposed an excessive sentence; and (4) the court erred in its calculation of court fines, fees, and costs.

¶ 19    Timothy contends the evidence did not prove him guilty because the State failed to rebut evidence that he acted in defense of Jason. Section 7-1 of the Criminal Code provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or

5

great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2012).

¶ 20    Our supreme court explained the burdens of proof:

"[T]o raise a claim of self-defense, a defendant must present evidence supporting each of the following elements which justify the use of force in defense of a person: (1) that force had been threatened against defendant; (2) that defendant was not the aggressor; (3) that the danger of harm was imminent; (4) that the force threatened was unlawful; (5) that defendant actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and (6) that defendant's beliefs were reasonable." *People v. Morgan*, 187 Ill. 2d 500, 533 (1999).

¶ 21    Once a defendant has made a minimal showing on each of the necessary elements for self-defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). We review the evidence in the light most favorable to the verdict, and we must affirm the verdict if any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 314 (1992).

¶ 22    The defense presented evidence that Larkins took money from Jason and challenged Jason to "do something bout it," then slugged Jason twice before Jason started to defend himself. Timothy joined the fight only when Larkins continued hitting Jason after Jason had apparently lost the fight. The fight ended with cuts made by a knife with a blade much longer than the blade of a box cutter. In terms of the *Morgan* factors, the evidence was undisputed that Larkins, was the

6

initial aggressor. To justify the use of deadly force, the defense presented evidence that Larkins committed robbery, a forcible felony (see 720 ILCS 5/2-8 (West 2012) ("'Forcible felony' means *** robbery.")).

¶ 23    While the trial court concluded that Larkins only engaged in theft, it is well established that if force is used, the crime is robbery. A conviction for robbery requires proof that an offender took property from the person or presence of another using force or by threatening the imminent use of force. While a conviction for theft only requires proof that defendant knowingly obtained or exerted unauthorized control over property of the owner with the intention to deprive the owner permanently of the use or benefit of the property. *People v. Rivers*, 194 Ill. App. 3d 193, 195 (1990).

¶ 24    Larkins first took money from Jason, then used physical force to keep it. Hence, the State did not disprove self-defense beyond a reasonable doubt simply because Larkins took the money first and then used force or because some of the physical struggle might have occurred after Jason went into the house and returned to the yard where the physical struggle continued. The forcible felony of robbery continued while Larkins continued to use force to keep the money he had taken. The timing does not disprove robbery.

¶ 25    We have addressed this issue in numerous cases, and we have recognized that there may be a "series of events" that begins with a taking. The "series of events" includes attempts to recover and/or to keep the property taken, and also includes a physical confrontation, all of which correspond to a "single incident or occurrence" that amounts to robbery. *People v. Brown*, 76 Ill. App. 2d 362 (1966); See also *People v. Chambliss*, 69 Ill. App. 2d 459 (1966), and *People v. Kennedy*, 10 Ill. App. 3d 519 (1973). In *Chambliss*, the defendant snatched the victim's wallet, and

an accomplice threw the victim to the ground when the victim started to chase the defendant. The court held that the use of force after the taking made the crime a robbery. *Chambliss*, 69 Ill. App. 2d 459. Similarly, in *People v. Brown*, 76 Ill. App. 2d 362, the defendant snatched the victim's wallet and struck the victim when the victim reached for the wallet. Again, it was contended that there was no robbery as force was used after the defendant had obtained the wallet. The *Brown* court concluded that the series of events created a single incident of robbery, and force was the means used to accomplish the taking. In *People v. Kennedy*, 10 Ill. App. 3d 519, the defendant took cash from a service station, and when an employee demanded the money, the defendant struck him. The courts in *Brown* and *Kennedy* held that those defendants committed robberies, even though the defendants possessed the stolen cash before striking the victims. Thus, in this case, the robbery continued because Larkins continued to use physical force to hold onto the money he had taken.

¶ 26    We reject any suggestion that this was not a robbery because Larkins had accused Jason of cheating. Illinois has rejected the idea that we should accept the "rule of the gun" rather than the "rule of reason." *People v. Robinson*, 68 Ill. App. 3d 687, 691 (1979). Several courts "have rejected [the argument] that a good faith belief by a defendant that he was entitled to the money or possessions of the victim to satisfy or collect on a debt is a defense to robbery." *People v. Tufunga*, 987 P.2d 168 (Cal. 1999). See also *People v. Reid*, 69 N.Y.2d 469, 508 N.E.2d 661, 663-665 (1987); *People v. Hodges*, (N.Y. App. Div.)113 A.D.2d 514 (1985); *People v Coates*, (N.Y. App. Div.) 64 AD2d 1 (1978); *People v Banks* (N.Y. App. Div.), 55 AD2d 795 (1976); *Crawford v. State* (Tex. Crim. App) 509 S.W.2d 582 (1974). "The law does not permit such self-help." *People v. Uselding*, 107 Ill. App. 2d 305, 309-10 (1969). Thus, the cheating claim does not distinguish

8

Larkins's crime from the crimes proven in *Chambliss*, *Brown*, and *Kennedy*. Larkins was committing a robbery, and the crime continued while Larkins continued to use force to hold onto the money that he had taken.

¶ 27    The State contends that Timothy cannot claim that he acted to prevent a robbery because in the video-recorded interview at the police station, Timothy did not mention the robbery as a reason for entering the fight. The State argues that, therefore, there is no evidence to support an inference that the robbery was the reason that Timothy became involved. "[I]ntent may be inferred not only through acts but through circumstances and surroundings as well." *People v. Malcolm*, 2015 IL App (1st) 133406. Circumstantial evidence supported an inference that Timothy reacted to the robbery and the force Larkins used to keep the stolen money. See *People v. Williams*, 132 Ill. App. 2d 806, 807–08 (1971).

¶ 28    Moreover, the State admits that the court convicted Timothy of murder based on accountability for what it concluded was Jason's act of stabbing Larkins. "Accountability is a legal theory whereby a defendant is held responsible for a crime which he personally did not commit, but which was committed by his accomplice. [Citation.] If the law places upon the accountable defendant all the liabilities arising from the acts of the accomplice, the law should also afford the accountable defendant the protections which would be afforded the accomplice, since the accountable defendant stands in the shoes of the accomplice." *People v. Brown*, 197 Ill. App. 3d 907, 919 (1990). Because there is no dispute that Jason acted in response to the robbery, Timothy may assert the robbery as justification for his acts as Jason's accomplice.

¶ 29    We find that Timothy presented evidence supporting findings in his favor on all elements of self-defense, including justification for the use of deadly force. To meet its burden of proving

that Timothy committed a crime, the State needed to disprove, beyond a reasonable doubt, at least one of the elements of self-defense. See *Lee*, 213 Ill. 2d at 224.

¶ 30    The trial court rested its finding of guilt upon its conclusion that the evidence did not show that Larkins robbed Jason. Unrebutted evidence showed that Larkins took cash from Jason and used force to keep it. As noted above, the robbery and the altercation that followed it were one continuous felonious action. The fact that the robbery occurred in connection with a card game did not change the nature of the offense. In Illinois, a person who uses forceful self-help to recoup gambling losses commits robbery. *People v. Robinson*, 68 Ill. App. 3d 687 (1979).

¶ 31    The State failed to prove that Timothy lacked legal justification if he used deadly force or was accountable for Jason's use of such force. Because the evidence does not support the conviction, we need not address Timothy's other arguments on appeal.

¶ 32                                III. CONCLUSION

¶ 33    Timothy presented sufficient evidence to support an inference that he used deadly force to prevent a forcible felony, and he showed all other elements necessary for self-defense. The State failed to prove beyond a reasonable doubt the negative of any element necessary for a finding that Timothy acted in self-defense of Jason. Accordingly, we reverse the conviction.

¶ 34    Reversed.

¶ 35    MIKVA, J., specially concurring:

¶ 36    I join fully in the majority decision in this case. I write separately only to acknowledge that I was a panel member on a decision in this case that has since been vacated, but which affirmed the defendant's conviction. On review of the briefs and the oral argument and the draft offered by

the authoring justice, I am convinced that, in fact, the State failed to rebut the defense that this defendant was acting in self-defense and therefore join the decision to reverse his conviction.

¶ 37    JOHNSON, J., concurring in part and dissenting in part:

¶ 38    I would reverse the trial court for different reasons and remand for a new trial.  I agree with my colleagues that defendant Barber presented sufficient evidence to support an inference that he used deadly force to prevent a forcible felony against codefendant Smith, however I would find that his claim of self-defense was imperfect.   I submit that this was a case of imperfect self-defense because, although the decedent was the aggressor, it was nonetheless a fist fight, decedent was unarmed, and there were two codefendants against the one aggressor, therefore rendering the belief of imminent harm unreasonable.

¶ 39    Nevertheless, despite the imperfect self-defense, I would not affirm the trial court. I would reverse and remand because I find that counsel was ineffective for failing to move for separate trials. The standard for reviewing an ineffective assistance of counsel claim is whether the attorney's conduct fell below an objective standard of reasonableness and whether defendant was prejudiced by counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. If either prong of the *Strickland* test cannot be shown, then the defendant has not established ineffective assistance of counsel. *Id.* at 697.

¶ 40    A defense decision not to seek a severance is generally considered trial strategy. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 65. Additionally, the general rule in Illinois as to severance is

11

that when defendants are jointly indicted, they are to be jointly tried unless fairness to one of them requires a separate trial to avoid prejudice. *People v. Johnson*, 187 Ill. App. 3d 756, 763 (1989); *People v. Bond*, 230 Ill. App. 3d 1086, 1088 (1992); *Bell*, 2021 IL App (1st) 190366, ¶ 65. Actual hostility between the two defenses is required. *Bond*, 230 Ill. App. 3d at 1088-89.

¶ 41     A defendant moving for severance must state how he would be prejudiced by a joint trial. *People v. McCann*, 348 Ill. App. 3d 328, 335 (2004); *Bell*, 2021 IL App (1st) 190366, ¶ 66. There are two primary forms of prejudice which are likely to require that jointly indicted defendants should be separately tried. *Bond*, 230 Ill. App. 3d at 1089. First, where the codefendants' defenses are so inconsistent or antagonistic that one of the defendants could not receive a fair trial if tried jointly with the other, severance is necessary. *Johnson*, 187 Ill. App. 3d at 763; *Bond*, 230 Ill. App. 3d at 1089. Second, if in a joint trial, the State introduces the extrajudicial admissions of a non-testifying codefendant which implicate the defendant, the defendant may be denied his constitutional right of confrontation because the defendant cannot call the codefendant to the stand for cross examination. *Johnson*, 187 Ill. App. 3d at 763.

¶ 42     I would find that both defendants had antagonistic defenses to one another such that counsel should have moved to sever the trials. Further, it was prejudicial for counsel not to do so based on information that was revealed during the discovery phase prior to trial. The antagonistic nature of the defenses is detailed below.

¶ 43     First, the medical examiner's testimony established that, although there were superficial cuts on decedent's body, the fatal stab wound was a six-inch deeper cut that pierced decedent's heart and lungs. Dr. Eason additionally opined that the fatal wound was caused by a knife with a flat edge such as a kitchen or steak knife. While there was testimony presented that Barber was

seen with a flip box cutter that was approximately three inches, and typically had a flat blade like a razor, Dr. Eason stated that it would not have caused the fatal wound and was consistent with the superficial wounds present on other parts of the decedent's body. Barber admitted to swinging the box cutter at decedent and cutting him on the back. However, he denied that he cut decedent near his lungs or heart, or that his box cutter was capable of inflicting such a wound. Additionally, there was no evidence presented that any other knife was present during the incident nor was Smith ever seen with a knife. Moreover, Smith maintains that he did not have a knife and that it was simply a fist fight on his part. In fact, both defendants argued in the trial court and maintain on appeal that the other must have inflicted the fatal wound.

¶ 44    Next, both defendants contend that they are not accountable for the actions of the other. On the one hand, codefendant Smith argues that he never asked Barber to intervene, nor did he expect Barber to interfere, in the fist fight he had with decedent. Further, codefendant Smith argued that he did not know or expect that Barber would slash at decedent with the box cutter or that decedent would receive a fatal wound. In contrast, while Barber admits that he intervened because decedent was getting the best of codefendant Smith and also that he slashed decedent with the box cutter, he essentially contends that Smith must have had another knife that caused the fatal wound, that he was not expecting that another weapon would be involved, or that decedent would receive a fatal blow.

¶ 45    Additionally, Barber's statement to police was admitted as evidence, albeit not against Smith. In the statement, Barber stated that he saw codefendant Smith run inside and someone said that Smith got a knife. Barber's statement also indicated that he interfered in the fight when decedent got the best of Smith and slashed at him with his box cutter, which he later threw in some

13

bushes when he fled. However, because there was but one factfinder in this joint bench trial, the factfinder necessarily had knowledge of the content of the statement when deciding both Barber and codefendant Smith's fate.

¶ 46    Even with regard to the self-defense claims, defendants' arguments are antagonistic. While Barber argues that they were each justified in using lethal force during the altercation with decedent, codefendant Smith contends that Barber alone was justified as he, Smith, never had a weapon during the fight. Barber's argument presupposes that Smith was armed with a kitchen knife during the fight.

¶ 47    When reviewing the defenses presented by each defendant, I would find no reasonable trial strategy to support counsel's failure to move for severance. I would further find that defendants were indeed prejudiced by counsel's failure to move for severance of the trials. Their individual defenses were clearly antagonistic as detailed above. In the joint bench trial, neither defendant could fully establish his argument that the other was responsible; the State argued that they were each accountable for the other's actions; and the trial court did not determine who inflicted the fatal blow. The trial court treated them as if they were acting in concert during the fight and likely had a similar viewpoint about their trial. I would find such viewpoint infringed upon defendants' right to a fair trial and effectively pitted both defendants against one another during the proceedings, as evidenced by their respective counsel's cross examinations of the State's witnesses. See *People v. Bean*, 109 Ill. 2d 80, 93-4 (1985). (When codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others, severance is required. Codefendant's trial strategy of depicting the other codefendant as the "murderer" unfairly placed the codefendant in the position of having to defend against two

14

accusers, the State and his codefendant). Based on the foregoing, I believe that severance was warranted and that counsel's motion to sever the trials would have been successful. Further, I would find that there is a reasonable probability that the outcome of the trials could have been different. As such, I would conclude that trial counsel was ineffective for failing to move for severance of the trials. Accordingly, I would reverse defendants' convictions and sentences and remand for new separate trials.